BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
LESLIE E. HURST (178432)
CAMILLE S. BASS (297609)
701 B Street, Suite 1700
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
lhurst@bholaw.com
cbass@bholaw.com

THE DAVENPORT LAW FIRM LLC
COURTNEY L. DAVENPORT
18805 Porterfield Way
Germantown, MD  20874
Tel: 703/901-1660
courtney@thedavenportlawfirm.com

Attorneys for Plaintiff and the Class

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

| | |
|---|---|
| DAVID BARANCO, individually and on behalf of all others similarly situated, | Case No. 3:17-cv-03580 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | CLASS ACTION |
| FORD MOTOR COMPANY, a Delaware corporation; LINCOLN MOTOR COMPANY, a Delaware corporation, | |
| Defendants. | **JURY TRIAL DEMANDED** |

00122394

BLOOD HURST & O'REARDON, LLP

1   Plaintiff David Baranco, individually and on behalf of all others similarly situated,

2   upon personal knowledge of the facts pertaining to himself and on information and belief as to

3   all other matters, by and through undersigned counsel, hereby brings this Class Action

4   Complaint against Defendants Ford Motor Company ("Ford") and Lincoln Motor Company

5   ("Lincoln") (together, "Defendants"), and alleges as follows:

6   **NATURE OF THE CASE**

7   1.      Certain model year Ford and Lincoln vehicles contain defects within the door

8   latch assembly that can cause unwarranted "door ajar" warnings which lead to the doors not

9   locking and the battery running down.  The models and model years at issue are: 2011 to 2016

10  Ford Edges ("Edge Vehicles"), 2012 to 2014 Ford Flexes ("Flex Vehicles"), 2013 to 2014

11  Ford Explorers ("Explorer Vehicles"), 2011 to 2013 Lincoln MKXs ("MKX Vehicles"), and

12  2013 Lincoln MKTs ("MKT Vehicles") (collectively, the "Subject Vehicles").

13  2.      All of the vehicles at issue in this litigation share a common defect: the vehicles

14  frequently, but intermittently, display a false "door ajar" warning even when all of the doors

15  are closed.  The warning may remain active for hours, including after the vehicle is turned off,

16  and it does not deactivate when the doors are opened and shut once again.  When the warning

17  is falsely activated, all of the doors unlock, and the driver is unable to relock them, permitting

18  passengers to open the doors while the vehicle is in motion and allowing the doors to open in

19  the event of an accident, thereby increasing the risk of harm to the vehicle's occupants.  These

20  false warnings also cause the interior dome lights to illuminate and remain on for an

21  unspecified period of time, and an audible alarm sounds repeatedly.  The failure of the dome

22  lights to extinguish makes it difficult to see the road and other vehicles at night.  And because

23  the lights can remain on long after the vehicle is turned off, the battery is at risk of draining.

24  3.      Owners whose vehicles are still covered by Defendants' three-year warranty are

25  required to pay a $100 deductible for the repair and/or a diagnostic fee between $100 and

26  $200.  However, the defect often arises outside of the warranty period, requiring owners to pay

27  up to $700 or more to repair a problem Defendants know will affect many of their customers.

28  Further, owners have reported that the problem continues to occur even after dealer service

BLOOD HURST & O'REARDON, LLP

1  technicians make the repair, suggesting there is a mechanical and/or electrical defect with the

2  door latch assembly switch itself.  Thus, many owners have had to pay for several repairs,

3  costing even more money and repeatedly imposing on their time.

4      4.    The warning lights and audible alerts in vehicles are an integral function of the

5  vehicles' safety systems.  They alert drivers to important vehicle conditions, including

6  potential dangers and service issues that require operator response in order to prevent a hazard

7  or an expensive repair.

8      5.    Similarly, studies show that door locks are crucial to the occupant protection

9  systems in a vehicle.  Door locks provide increased securement of the vehicle door, protecting

10 occupants from ejection out of the vehicle during rollover crashes, saving hundreds of lives

11 each year.  Thus, the National Highway Traffic Safety Administration ("NHTSA") has urged

12 that parents look for automated safety locks when purchasing a vehicle to reduce the risk of

13 children being ejected.

14     6.    Studies also show that glare from interior vehicle lights activated during

15 nighttime driving reduce driver visibility and increase driver distraction.

16     7.    Consumers rely on automakers, such as Ford, to promptly inform them and

17 initiate a remedy or countermeasure when they discover a vehicle model contains a defect,

18 especially one that is present in multiple models and model years and that puts the safety of

19 themselves and their passengers at risk.

20     8.    Defendants have represented that their vehicles are safe and that the warnings

21 and alarms will sound only if a vehicle door is open, and their customers expect the vehicles to

22 perform as represented.  Contrary to this promise and expectation, the door latch assembly of

23 the Subject Vehicles were designed, manufactured, and sold with a defect that mistakenly

24 recognizes the door as ajar when it is closed.  As a result, the Subject Vehicles' doors remain

25 unlocked and the internal door warning lights remain on, which render the vehicles unsafe.

26     9.    Ford and Lincoln have long known that the door latch assembly on the Subject

27 Vehicles are defective because they can cause unwarranted "door ajar" warnings which lead to

28 the doors not locking and the battery running down.  In fact, in 2014, Ford issued a Technical

BLOOD HURST & O'REARDON, LLP

1    Service Bulletin ("TSB") to dealers advising that some Subject Vehicles "may exhibit a door

2    ajar lamp illuminated with all doors closed" and instructing service technicians to clean the

3    door latch electrical connector.  TSBs are not sent to customers or reported publicly.

4        10.    In September 2016, NHTSA opened a Defects Investigation (PE16-012) after

5    receiving 1,560 complaints related to the 2011 to 2013 Ford Edge.  NHTSA learned that Ford

6    had also received 1,418 complaints and 33,074 warranty claims for the false "door ajar"

7    defect.

8        11.    During the NHTSA investigation, Ford admitted that a change it implemented

9    to the Body Control Module in its vehicles beginning with model year 2011 created a defect

10   that caused contamination buildup in the connector, resulting in the false "door ajar" warning.

11       12.    Despite their knowledge of the safety risks and high repair expenses associated

12   with this defect, Ford and Lincoln failed to disclose the existence of this defect to Plaintiff,

13   other Class Members, and the public.  Nor have they paid for the repairs, offered to reimburse

14   the Subject Vehicle owners for costs incurred to identify and repair this defect, extended the

15   warranty, or issued a recall.  Rather, Ford has refused to take any action to correct this

16   concealed design defect.

17       13.    Additionally, because thousands of consumers have complained of the defect

18   on online websites, the resale value of the Subject Vehicles has diminished.  Had the Class

19   Members been aware of the design defect and its associated costs, they would not have

20   purchased the Subject Vehicles, or would have paid substantially less for them.

21       14.    Plaintiff and the Class purchased and leased vehicles that are of a lesser

22   standard, grade, and quality than represented, and they did not receive vehicles that met

23   ordinary and reasonable consumer expectations regarding safe and reliable operation.

24       15.    As a result of Ford's unfair, deceptive, and/or fraudulent conduct, owners of the

25   class vehicles have suffered loss of money and/or lost value.  Plaintiff and Class Members

26   have suffered injury in fact and incurred damages.

27   ///

28   ///

BLOOD HURST & O'REARDON, LLP

3                              Case No. 3:17-cv-03580
CLASS ACTION COMPLAINT

**JURISDICTION AND VENUE**

16.     The Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §1332(d) because: (a) this action is brought as a proposed class action under Fed. R. Civ. P. 23; (b) the proposed Class includes more than 100 members; (c) many of the proposed Class Members are citizens of states that are diverse from Defendants' citizenship; and (d) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

17.     Venue is proper in this judicial District under 28 U.S.C. §1391(b) because a substantial part of the challenged conduct or omissions giving rise to claims occurred and/or emanated from this District, Defendant Ford maintains one of the largest automotive research centers in this District, and Defendants have caused harm to Class Members residing in this District.

**PARTIES**

18.     Plaintiff David Baranco resides in and is a citizen of the State of California.  In or around May 2016, Mr. Baranco, who resides in San Rafael, purchased a 2013 Ford Edge in Santa Clara, California.   Within a week of his purchase, Plaintiff Baranco's Ford Edge manifested the "door ajar" defect, which defect continues and is ongoing.

19.     Defendant Ford Motor Company ("Ford") is incorporated in the State of Delaware and is headquartered in Dearborn, Michigan.  Ford sells, markets, distributes, and services Ford and Lincoln vehicles in California and throughout the United States, including the Subject Vehicles.  It is the parent company of Lincoln Motor Company.   Ford also established the Ford Research and Innovation Center in Palo Alto, California in 2015, and plans to double its current staff of 130 by the end of 2017.

20.     Defendant Lincoln Motor Company ("Lincoln") is incorporated in the State of Delaware and is headquartered in Dearborn, Michigan.  Lincoln sells, markets, distributes, and services Lincoln vehicles in in California and throughout the United States, including the Lincoln Subject Vehicles.  It is a subsidiary of Ford Motor Company.

///

///

BLOOD HURST & O'REARDON, LLP

00122394

BLOOD HURST & O'REARDON, LLP

21.     Ford and Lincoln are the alter egos of one another and operate as a single business enterprise for the production, marketing, and sale of the Subject Vehicles.  Ford and Lincoln share the same ownership, management, and headquarters.  The Subject Vehicles are manufactured in Ford's facilities.  Ford and Lincoln work in concert with each other to profit from the sale of the Subject Vehicles by marketing them as safe when they are not.

**FACTUAL BACKGROUND**

**I.      THE FALSE "DOOR AJAR" WARNING DEFECT**

22.     The Subject Vehicles are the 2011 to 2016 Ford Edge, 2012 to 2014 Ford Flex, 2013 to 2014 Ford Explorer, 2011 to 2013 Lincoln MKX, and 2013 Lincoln MKT.

23.     The Ford Edge is a midsize crossover SUV that debuted in model year 2007.  For model year 2011, Ford unveiled the next generation, with new features both externally and in the interior.

24.     The Ford Flex is a full-size crossover utility vehicle that debuted in model year 2009.  Ford introduced a new generation of the Flex for model year 2013, changing the exterior design and adding new features and a sleeker look inside.

25.     The Ford Explorer is a full-size SUV that debuted in model year 1991.  The Explorer's last generation overhaul was unveiled in model year 2011.

26.     The Lincoln MKX is a midsize luxury crossover SUV that uses the same platform as the Ford Edge.  Like the Edge, the MKX's latest generation was released in model year 2011.

27.     The Lincoln MKT is a full-size luxury crossover utility vehicle made using the same platform as the Ford Flex.  Like the Flex, the MKT was updated for model year 2013.

28.     As demonstrated in the image below, the Subject Vehicles contain a door latch assembly that has an integral mechanical switch (also known as a sensor) and door lock actuator.  The switch signals on or off when the door is open or closed.  This is a typical arrangement: a switch is open or closed based on the whether the door is open or closed.  The vehicle computer reads the voltage signal from the switch, usually 5 volts signifies on, zero volts closed.

00122394
**CLASS ACTION COMPLAINT**

29.     The Subject Vehicles contain a Body Control Module ("BCM") that monitors the voltage from the door latch switch and continuously samples it to determine its position (*i.e.*, open or closed).  Ford has represented to NHTSA that when the switch communicates that the door is closed, the BCM sends a "wetting current" through the electrical connector from the door latch switch to the BCM to keep it clean.  A wetting current is the minimum electric current needed to flow through an electrical contact to break through the surface film resistance on the contact.  A film of oxidation can occur due to humidity and exposure to moisture.

30.     According to their Owners' Manuals ("Manuals"), all of the Subject Vehicles contain Ford's autolock feature, which can be disabled through an authorized dealer or using the information display if the vehicle is equipped with that capability.  For example, the Manual for the 2013 Ford Edge states:

///

BLOOD HURST & O'REARDON, LLP

The autolock feature [if enabled] will lock all the doors when:

- all the doors are closed,
- the ignition is on,
- you shift into any gear putting your vehicle in motion, and
- your vehicle reaches a speed greater than 12 mph (20 km/h).

The autolock feature repeats when:

- you open then close any door while the ignition is on and the vehicle speed is 9 mph (15 km/h) or lower, and
- your vehicle then reaches a speed greater than 12 mph (20 km/h).

31.     The 2013 Ford Edge Manual states that warning lamps and indicators "can alert you to a vehicle condition that may become serious enough to cause expensive repairs. The "Door Ajar" warning "[d]isplays when the ignition is on and any door is not completely closed."

32.     The Manual states that the vehicle's overhead dome lamp will illuminate when an occupant depresses an instrument panel switch or when any door is opened. Under a heading of "Battery Saver," the Manual states: "If you leave the courtesy lamps, dome lamps or headlamps on, the battery saver shuts them off 10 minutes after you switch the ignition off."

33.     The Manual states: "WARNING: Driving while distracted can result in loss of vehicle control, crash and injury. We strongly recommend that you use extreme caution when using any device that may take your focus off the road. Your primary responsibility is the safe operation of your vehicle." The warning is referring to the use of electronic devices while driving, but it is also applicable when the "device" is a defective vehicle that keeps needlessly chiming an alarm, turning on bright lights that make it difficult to see outside, and unlocking doors.

34.     Each of the Subject Vehicles carries with it a "Bumper to Bumper" Warranty that extends to three years, or 36,000 miles, whichever comes first.

35.     In 2014, Ford informed dealers through a TSB that the 2011 to 2013 Edge Vehicles, 2013 Flex Vehicles, 2013 to 2014 Explorer Vehicles, 2011 to 2013 MKX Vehicles, and 2013 MKT Vehicles "may exhibit a door ajar lamp illuminated with all doors closed." Ford instructed dealers to remove the door latch or door trim panel and use a tool called the

Essential Special Service Tool to "clean" the inside of the door latch electrical connector. This procedure was supposed to clear the switch contacts of contamination allowing a clear electrical path to ground when the switch is closed, thus allowing the BCM to receive an accurate reading to determine whether the door was open or closed. Ford's explanation of the problem to NHTSA later specified that the contamination was specific to the electrical contacts on the switch.

36. When the BCM receives a voltage signal that indicates the door is open, it communicates with the Instrument Panel Cluster, which triggers an audible warning, activates a visual warning on the instrument panel, and sends out a visual intermittent "shift to park" message because it believes the doors are open and thus the vehicle is stopped. In addition, all interior lights are illuminated and the doors are unlocked, and they cannot then be manually relocked. This dangerous situation can continue for several hours, even after the vehicle is parked and turned off, draining the battery and potentially stranding vehicle occupants. These functions are activated by design and are intended to alert the driver a door is open.

37. In response to NHTSA's investigation, Ford admitted to a defect, stating: "Beginning with the 2011 model year Edge vehicles, a change in BCM strategy resulted in a reduction of the wetting current sent out to clean the switch contacts by more than 75%. Over time, this low level of current is not sufficient to keep the switch contacts clean and contamination build up causes them to fail …."[1]

38. According to NHTSA, over 2,670 people have reported false door ajar problems to the agency and Ford and more than 33,000 warranty claims had been submitted.[2] In addition to complaints regarding the vehicles listed in Ford's TSBs, owners of 2014 Edge Vehicles and 2014 Flex Vehicles have reported the same issue.

39. Some Subject Vehicle owners have been exposed to hazards as a result of the false door ajar warnings. NHTSA has said it has received 14 complaints that doors opened while the vehicle was in motion. In the complaints to the agency, which are publicly available

_____

[1]   NHTSA, PE16-012, ODI Closing Resume (Mar. 30, 2017).
[2]   NHTSA, PE16-012, ODI Closing Resume (Mar. 30, 2017).

BLOOD HURST & O'REARDON, LLP

8                                          Case No. 3:17-cv-03580

on the agency website, at least one occupant reported falling outside of the vehicle, and another reported a theft while his vehicle was parked and unlocked.  For example:[3]

> My vehicle is a 2014 Ford Edge with less 40,000 miles.  The door ajar sensor is malfunctioning thus preventing the door to lock while vehicle is in motion and the interior dome light stays on while driving.  My child has opened the door on many occasions while vehicle was in motion and almost fell out.  Ford is aware of this issue and there many online forums with customers having the same issue dating back to 2010.  And instead of doing recall ford has issued a tsb. (ODI 10640829)[4]

> My door ajar light dome light stays on even though the door is shut it's dangerous while driving at night due to domelight staying on its distracting cause door ding sounds off while driving  been stranded one time cause dome light stood on but the one thats the worst I was so used to still driving with light on I was in my parking lot luckily with wife I turn on car dome light is on so I figure door is shut its just the sensor going off like always but door shut this time the door was open not shut I turn and fall off car lucky wife pressed break one day a person is going to think its just the sensor going off and door is locked while actually its open get hurt and I'll be the first witness for that persons lawsuit against ford cause they are acting like thats not a recall situation shame on Ford I will never buy a ford and will tell everyone and their brother the same thing they say buy a ford cause its ford tough better said ford tough luck.  (ODI 10865235)

> Unable to lock doors from within cabin due to door ajar sensor.  Child easily opens door while driving.  Had a stranger open my door and got in passenger seat thinking it was his mothers car, than [sic] goodness he did not have a gun. Lack of safety and security function.  (ODI 1216751)

> Driver's door sensor is faulty.  The vehicle's instrument panel will indicate that the door is ajar when it is firmly closed.  This alert often appears while the vehicle is in motion.  When I exit the vehicle and the problem occurs, this will prevent the interior lights from going out and it will prevent the security system from arming.  This problem is distracting while driving due to the alerts and the interior lighting, especially at night.  The issue has also resulted in theft from my vehicle.  When the vehicle is off, the dome lights do not go off as the sensor indicates the door is open.  While parked outside my house, my vehicle was broken into without the alarm sounding, resulting in theft of personal items including checks, cash, and electronics.  The vehicle's battery has also drained overnight to the point of needing a jump start.  (ODI 10837099)

---

[3]     All complaints to NHTSA have been reproduced as originally written and may contain spelling or grammatical errors.

[4]     The term "ODI" means NHTSA's Office of Defects Investigation.

BLOOD HURST & O'REARDON, LLP

Case No. 3:17-cv-03580

**CLASS ACTION COMPLAINT**

00122394

40.   Many other owners reported to NHTSA that the false "door ajar" warning creates a safety hazard.  For example:

> The door ajar indicator remains lit even when door is properly secured.  This results in the interior lighting remaining on and failure of the door locks to properly activate, even at highway speed.  I am a former investigator for the U.S. DOT and I find this to be a very dangerous situation which should be recalled.  If the doors are not properly locked there is an increased risk to occupants of the vehicle in the event of a crash.  (ODI 10861426)

> We were on our way to Texas from Missouri.  As we were traveling south on I35 a warning light came on the dash stating that the driver's door was ajar when it appeared to be shut.  It then told us to shift to park and shut the door.  We pulled over on I35 thinking it was something that we needed to do for safety reasons.  My wife got out of the vehicle and was almost hit by a car at highway speeds.  After shutting the door several times the warning light would not go off as well as the dome light.  Because of the issue the doors would not lock and the alarm would not arm itself.  I have been a local police officer for KCPD for 14 years and have seen far too many accidents because of people pulling over on a highway.  This issue needs to be addressed and fixed on all ford vehicles.  (ODI 10731557)

> The driver's door warning drivers door is ajar will not go off.  Even when car is off, lights remain on inside the car.  While driving, light and warning continually stay on, doors will not lock because sensor for door remains on.  When I come to a stop while car is running, warning to shift car to park will come on … this is a huge safety problem with little children in car.  Doors will not stay locked.  (ODI 10905592)

> The door ajar alarm will sound even when the door is secure.  When this occurs the interior lights come on and it gives a audible signal.  Interior lights coming on are hazardous when driving at night especially when it happens expectantly.  This activation also causes the lights to stay on after you leave the vehicle.  This has caused the battery to drain and not being able to start the engine.  This happen to my wife while at work.  Fortunately, this time, it wasn't in a remote location, but it could happen.  Ford refuses to recall or repair at their cost, even though I had it repaired previously (while under warranty).  (ODI 10853493)

> Two door ajar lights on our 2011 edge remain on at all times.  Bea aide [*sic*] of this I am forced to drive at night with the interior lights on.  This is unsafe and very distracting for us and other drivers.  One of these doors is my daughters which we are very uneasy about.  We are aware how big this problem is and people are desperate for help!!!  I wrote to ford but they said they can't help because there are no recalls and they can't find any record of our car being at a ford dealer so I just sent them the invoice.  I cannot believe there are so many vehicles with the same problem and ford won't do anything about it.  (ODI 10898371)

When starting and shutting off the car, the "driver door ajar" warning comes on and interior lights will not shut off.  You have to continually slam the door to get both to go out.  Sometimes the warning light and interior lights come on while driving.  This makes it extremely difficult to see the road when it's dark outside.  I almost went into a ditch last week because of this issue.  I started complaining about this issue while still under warranty but the ford dealer did not fix it.  Now they want $500 to correct the problem.  Ford should be accountable for this known safety issue - not the consumer.  (ODI 10826096)

When my car was under warranty driver door would say door ajar and all locks would open when the door was closed - they fixed had to fix door sensor now my other doors are doing the same and we are out of warranty - this is a safety issue when driving at night and your door locks open at a stop light anyone can carjack or jump in your car, will not let me kids use my car - the car dealership told me they have so many flex repairs of this same issue.  (ODI 10845784)

41.    Ford TSB 15-0013 specifies a flat-rate time of 0.6 to 2.7 hours (depending on the model, trim package, etc.) to perform the fix to correct the false warning.  Most automotive dealerships charge $100.00 to $125.00 per hour for service repairs.  Thus, owners can expect to pay up to $337.50 if the dealer performs the specified fix.  However, many customers who have had the connector cleaned continue to experience the false warning, either on the repaired door or a different door, requiring further repairs:

For the third time the "driver door ajar" warning light is illuminated while the door is closed and presumed locked.  The dealer made repairs the first two times and now is charging me agin [*sic*] for this third occurence [*sic*] of the same issue stating they previously only cleaned the part which is now determined to need replacement.  My teenager often drives this vehicle and we do not know if the driver door is closed or locked because of the defect in the warning system.  (ODI 10672510)

The sensor in my drivers door does not recognize the door is closed.  As I'm driving the doors will not lock and the interior lights flash on and off because the electrical system thinks the door is opening.  Also the vehicle alerts me with every bump I hit in the road that the door is ajar with a screen alert and ringing bell.  I brought this to the dealership and spent $150 to have it cleaned which helped for 6 months and now it is acting up again.  (ODI 10691819)

The contact owns a 2013 Ford Edge.  Immediately after starting the vehicle with all the doors closed, the door ajar warning light illuminated.  The vehicle was taken to a dealer where it was diagnosed that a switch needed to be replaced.  The vehicle was repaired; however, the failure recurred.  The vehicle was taken back to the dealer where it was diagnosed that the replaced switch needed to be cleaned.  The vehicle was repaired; however, the failure persisted.

Case No. 3:17-cv-03580

BLOOD HURST & O'REARDON, LLP

00122394

1
2
3
4
5
6

The manufacturer was not notified of the failure.  The failure mileage was 55,000.  (ODI 10874316)

Door ajar at driver's side "on" intermittently, either parked or driving until it remained "on" all the time even after shifting to park, opening and closing the door, turning the engine on and off.  Warning showed need to shift to park.  Hazardous when driving, especially on the freeway.  Ford maintenance repaired/cleaned latch on 4/2015 and charged $269.90.  Same problem reappeared on 12/2015.  Ford maintenance replaced/repair faulty door latch on 1/2016 and charged $317.  (ODI 10818276)

7
8
9
10
11
12

42.     Numerous other reports claim the dealership is replacing the door latch assembly, door modules, wiring harness, or other components rather than performing the repair procedure outlined in bulletin.  This is substantially more expensive than simply cleaning the electrical connection.  Thus, customers are being charged much higher prices for the repair of the door ajar warning than if the repair procedure outlined with the associated Ford fix were to be performed (and actually correct the defect).  For instance:

13
14
15
16

There is an instrument panel alarm that says "driver door ajar" that remains despite repeated opening and closing of the driver's door.  We paid almost $600 to have the sensor replaced about a year ago, and now it is doing the same thing.  The dealership wants to charge us again to fix it.  It is a safety issue… (ODI 10864600)

17
18
19
20
21

For months I have dealt with doors showing ajar, even when closed.  Inside lights stay on... And alarm sounds often.  First it was the passenger door, now the driver door and right rear passenger door constantly say ajar.  Alarm sounds in the middle of the night.  It has become necessary to disconnect battery cable every night in order for this not to happen.  Recently had to purchase new battery.  Passenger door was repaired at no cost to me...  But dealerships want to charge me $1000 to repair door latches on driver door and rear passenger door, which on a 2013 vehicle is ridiculous.  (ODI 10779827)

22
23
24
25

The door front driver side door sensor went bad and tells car that door is ajar.  This was replaced under warranty last year.  Now yesterday the same thing has happened to the front passenger side door sensor.  This was quoted to me at $700.  This is ridiculous for a bad door sensor that Ford has put bad and faulty sensors on.  I feel that I should not be liable for.  The Ford dealership in town said, "this is a problem with Ford Flex."  (ODI 10745861)

26
27
28

2011 Ford Edge door ajar light and dome light stays on after shutting door.  It ended up being the sensor in the front passenger door and front drivers door.  The front drivers door sensor was replaced twice in 2013 and once in 2014.  The passenger side door was replaced in 2014 and in January 2015.  The door sensor issue started at 34,000 miles.  We are currently at around 43,000 miles

BLOOD HURST & O'REARDON, LLP

1
2
3

and the door sensors continue to be a major problem.  Replacing the drivers side door sensor 3 times in 2 years and the passenger side door sensor in 2 years as well should not happen, especially only driving 9,000 miles in those 2 years. (ODI 10671674)

4
5
6
7

Drivers side door latch faulty, was showing door ajar when closed which prevented doors from locking and kept interior lights on not sure if airbag would arm or not.  Was under warranty and took to dealer for repair and was told it just needed to be reset.  Dealer did not document the repair and when the problem started happening again a few months later I was told it would be $600 to replace the latch.  Ford knows about this problem and has issued a technical bulletin but has not issued a recall.  (ODI 10730729)

8
9
10
11

Driver door ajar light would not go off, even though the door seemed to be closed.  Thus doors would not lock and occasionally warning lights would flash, distracting me as I drove.  I took the car to my local Ford dealer and was told it was a faulty front door latch, which they replaced for $425.65.  (ODI 10861649)

12
13
14

43.    Because the lights stay on for hours, including overnight, many consumers have had their batteries drained, leaving them stranded and concerned for their safety.  Sometimes the drained battery also affects other systems in the vehicle:

15
16
17
18
19
20

At the end of February my "door ajar" light kept staying on after closing it- I had to repeatedly close it to get the light to go off.  On March 5th my vehicle lost power while traveling down a main highway at night with my 2 year old daughter.  I had to pull over and wait for someone to come help us … the driver's side door latch had gone bad and since it stayed on it killed my battery along with my throttle body had gone bad in my car as well….  I have in turned been waiting now 5 weeks for the throttle body part for my car, which has left me having to borrow a way to go because I can't afford to fix my car and pay for a rental.  (ODI 1276812)

21
22

The "door ajar" warning light comes on intermittently and has drained the battery at least 4 times over the past 10 months.  The dead battery has left me stranded on several occadions [*sic*].  (ODI 10703795)

23
24
25

I am having the same issues as hundreds of others have had and posted on the NHTSA site.  The door ajar issue followed by the shift to park issue … battery also went dead around 47000 miles and crashed my gps.  Approximately $900 to fix the three issues.  (ODI 10609157)

26
27
28

44.    Multiple consumers reported trying to repair the problem themselves or not having the repair done because it is too expensive.  This leaves consumers in a dangerous situation because they cannot afford to remedy a defect.  For example:

00122394

Drivers side door ajar indicator continuously going off when door is shut. Continues to stay on after several attempts to shut door to make alarm go off. Makes it a driving distraction. Has been an ongoing issue and we just took it to the dealership to have repaired. Our extended warranty will not cover the problem and the dealership wanted over $500 to repair. We cannot afford the repair right now so we have to deal with it until we can. Again, a major driving distraction. (ODI 10808940)

First door ajar warning would come on, when you closed door it would go away. Now it just stay on, the lights say on and the bells chimes. I see theirs [*sic*] a lot of complaints on the internet. Please help!!! This is not in my budget!! Thanks. (ODI 10592180)

[I]n order for the door to close and not have the door ajar warning light come on the driver must loosen the latch before closing the door. Even if one does this, it does not guarantee that it would not pop on while driving. Extremely dangerous. (ODI 10499482)

The driver side door ajar warning sensor stays on. This caused interior and exterior lights to remain on. Took hours to "fool" the system to get warning sensor to deactivate, consequently all lights went out. Ford dealership service department swore they never heard of this yet owner complaints are all over the internet. (ODI 10691253)

45.     The defect is dangerous, distracting, and expensive enough that some owners have created videos to explain their home remedies to other consumers. For instance, Jason Anderson explained how to ground the switch on a 2013 Flex, telling viewers that he already spent $1,200 in unsuccessful repairs.[5] The fix has its own risks, however, because it tricks the BCM into always thinking the door is closed, so that it will not detect a door that is open while the vehicle is in motion.

46.     Despite thousands of complaints and tens of thousands of warranty claims, NHTSA closed the investigation in March 2017, stating that "an unreasonable risk to motor vehicle safety has not been identified" because the doors stay shut, even if they are not locked. NHTSA noted, however, that "[t]he closing of this investigation does not constitute a finding by NHTSA that a safety-related defect does not exist."[6]

///

---

[5]     *See* https://www.youtube.com/watch?v=zYOTHnPUQXM&feature=youtube.

[6]     NHTSA, PE16-012, ODI Closing Resume (Mar. 20, 2017).

BLOOD HURST & O'REARDON, LLP

II.    **THE "DOOR AJAR" DEFECT CREATES UNSAFE CONDITIONS**

A.    **Door Locks Are Integral To Occupant Safety**

47.    Multiple studies and evaluations, including many by NHTSA, have found that locked vehicle doors are integral to occupant safety, both in crashes and to prevent children and/or thieves from opening doors.

48.    In the 1950s, automakers began a concerted effort to install strong door locks in their vehicles after concluding that most occupant ejections, which often resulted in fatality, could be prevented if the doors remained closed during a crash.  A 1962 study comparing the rates of ejections and deaths prior to 1956, when many automakers introduced a stronger, modified safety lock, to rates after that year found that the rate of doors opening decreased by 32 percent, and the rate of ejection decreased by almost 40 percent.  The study concluded that if all vehicles had the modified safety locks, 1,800 lives would be saved annually.[7]

49.    In 1968, NHTSA implemented Federal Motor Vehicle Safety Standard ("FMVSS") 206, Door Locks and Door Retention Components, which was aimed at decreasing the likelihood of a vehicle occupant being ejected during a crash.[8]  FMVSS 206 requires that each door be equipped with a locking device that prevents someone outside the vehicle from opening the door and that allows the vehicle occupants to unlock the doors.  It does not require that vehicles have a particular locking mechanism, only that vehicle doors stay latched and not disengage during several specific crash test scenarios.  Many manufacturers have adopted the autolock feature to meet the test requirements.  These features cause the doors to lock after the vehicle is put into gear and reaches a targeted speed and to remain locked unless the driver chooses to unlock them or immediately following a crash.

///

///

///

///

---

[7]    John W. Garrett, Evaluation of Effectiveness of Door Locks on Pre-1956 and Post-1955 Automobiles, 77 Pub. Health Reports 369 (May 1962).

[8]    *See* 49 C.F.R. §571.206.

Case No. 3:17-cv-03580

CLASS ACTION COMPLAINT

BLOOD HURST & O'REARDON, LLP

00122394

50.     A 1989 NHTSA evaluation of the effect of FMVSS 206 in rollover crashes in passenger cars between 1963 and 1982 noted that the "design of doors and their locks, latches and hinges is crucial here."[9]  During that time, the rate of rollovers actually increased because smaller vehicles have a higher propensity for rollovers.[10]  However, the improved door latches and locks prevented 15 percent of rollover ejections in passenger cars, saving 400 lives annually.[11]  In 2002 alone, improved locks and latches saved an estimated 1,398 lives.[12]  An updated evaluation published in 2004, found that improved door locks in light trucks prevented ejections in rollovers by 10 percent.[13]

51.     In 2004, and again in 2008, NHTSA proposed to study the safety and effectiveness of automatic door locks ("ADL"), such as those used in the Subject Vehicles, stating: "ADL improve the likelihood that doors will stay closed in the event of an accident, retaining the structural integrity of the vehicle and lowering the chance of occupant ejection. In addition, they prevent doors from being opened accidentally and/or by children."[14]  In its 2004 proposal, NHTSA noted that General Motors had petitioned the agency to allow vehicles equipped with ADL to be tested with the doors locked because it argued they are a safety device.[15]  In 2008, NHTSA noted that during side-impact tests, "doors of vehicles with ADL have become unlatched and swung open when tested in the unlocked position, but not when tested in the locked position."[16]

///

---

[9]     Charles J. Kahane, NHTSA Report No. DOT HS 807 489, An Evaluation of Door Locks and Roof Crush Resistance of Passenger Cars – Federal Motor Vehicle Safety Standards 206 and 216 (1989), at xv.

[10]    *Id.* at xviii.

[11]    *Id.* at 224.

[12]    NHTSA, Report No. DOT HS 809 833, Lives Saved by the Federal Motor Vehicle Safety Standards and Other Vehicle Safety Technologies, 1960-2002 (2004), at 72.

[13]    *Id.* at xviii.

[14]    NHTSA, Report No. DOT HS 809 699, Evaluation Program Plan – Calendar Years 2004-2007 (2004), at 28; *see also* NHTSA, Report No. DOT HS 810 983, Evaluation Program Plan, 2008-2012 (2004), at 26.

[15]    NHTSA, Report No. DOT HS 809 699, at 28.

[16]    NHTSA, Report No. DOT HS 810 983, at 26.

BLOOD HURST & O'REARDON, LLP

BLOOD HURST & O'REARDON, LLP

52.     In 2015, NHTSA concluded that improved door locks had saved a total of 42,135 lives between 1960 and 2012, primarily in rollover crashes.[17]

53.     NHTSA has repeatedly urged parents to purchase vehicles with automatic door locks.  In its general guide to parents on safety features to consider when purchasing a vehicle, NHTSA stated:

> **Automatic door locks:** To prevent accidental door openings in a moving vehicle and to reduce the risk of occupant ejection in a vehicle crash, some manufacturers offer automatic door locks that activate when the car is put into gear or reaches a certain speed.  Automatic door locks also prevent unlawful forced entry into the vehicle when stopped in traffic.  There are also child safety door locks that the driver can control.  When child safety locks are engaged, the rear doors cannot be opened from the inside.[18]

54.     Additionally, in annual guidelines for parents, NHTSA has noted that "[i]t is important that the rear doors be locked when children are in the rear seat so that they do not inadvertently open them while in transit."[19]  The agency noted that 75 to 80 percent of vehicles had ADL by 2009.

55.     As NHTSA noted, door locks also prevent unlawful entry into vehicles, including motor vehicle theft.  Statistics vary by source, but the Department of Justice's Bureau of Justice Statistics ("BJS") found that in 2015, there were 465,650 motor vehicle thefts in the United States.[20]  The motor vehicle theft rate has decreased dramatically since 1993: BJS has determined that between 1993 and 2010, thefts decreased from about 19 percent to about 5 percent.[21]

///

---

[17]     Charles J. Kahane, Paper No. 15-0291, Lives Saved by Vehicle Safety Technologies and Associated Federal Motor Vehicle Safety Standards, 1960 to 212 – Passenger Cars and LTVs (2015), at 10.

[18]     NHTSA, A Parent's Guide to Playing It Safe with Kids and Cars, at 3.

[19]     See, e.g., NHTSA, Buying a Safer Car for Child Passengers: A Guide for Parents (2009), at 5.

[20]     Dep't of Justice, Bureau of Justice Statistics, Report NCJ 250180, Criminal Victimization 2015 (2016), at 5.

[21]     Janet L. Lauritsen & Maribeth L. Rezey, Dep't of Justice, Bureau of Justice Statistics, Measuring the Prevalence of Crime with the National Crime Victimization Survey, NCJ 241656 (2013), at 11.

00122394

17                                             Case No. 3:17-cv-03580

CLASS ACTION COMPLAINT

BLOOD HURST & O'REARDON, LLP

56.     Evaluations of the reasons the motor vehicle theft rate has declined dramatically are scarce.  However, a study of similar theft reductions in the United Kingdom concluded that it was not because there were fewer attempts – the percentage of attempted thefts actually rose during the evaluated time frame – but rather because of an increase in vehicle security, including better quality locks.[22]

57.     As some consumers noted in their complaints to NHTSA, a significant concern for vehicle occupants who are unable to lock the vehicles' doors is attempted theft while they are in the vehicle, known as carjacking.  The BJS estimated that between 1993 and 2002, the latest statistics publicly available, about 34,000 carjackings occurred annually, resulting in approximately 15 fatalities per year and injuries to about one-third of the victims.[23]

58.     In its information to the public about carjackings, the U.S. Department of State urged vehicle occupants to keep doors locked and windows up because it "increased your safety and makes it more difficult for an attacker to surprise you."[24]  Plaintiff and the Class are willing but unable to follow this logical guidance because of the Subject Vehicles' defect.

**B.      Unceasing Interior Lights And Audible Warnings Pose Unsafe Distractions For Drivers**

59.     Ford prides itself on its commitment to reducing driver distractions, stating:

Distracted driving is an important issue for everyone on the road today.  According to a 100-car study conducted by Virginia Tech Transportation Institute, driver inattention that may involve looking away from the road for more than a few seconds is a factor in nearly 80 percent of accidents.

Ford Motor Company devotes considerable attention to this traffic safety issue through research, testing, education and technology … [25]

[22]     Graham Farrell, Attempted Crime and the Crime Drop, 26 Int'l Criminal Justice Rev. 21 (2016), at 23, 25.
[23]     Patsy Klaus, Dep't of Justice, Bureau of Justice Statistics, National Crime Victimization Survey: Carjacking, 1993-2002, NCJ 205123 (2004), at 1.
[24]     U.S. Dep't of State, Publ'n No. 10863, Carjacking: Don't Be a Victim (2002).
[25]     Ford, Reducing Driver Distractions (2012), PDF *available at* https://media.ford.com/content/fordmedia/fna/us/en/news/2013/07/19/safe.html.

60.     NHTSA is well aware that false alarms, and even necessary auditory alarms and displays, can cause dangerous distractions for drivers.   NHTSA's Human Factors Design Guidance for Driver-Vehicle Interfaces warns that:

> False alarms are defined as alarms that indicate a threat when no threat exists. They can cause driver distraction, incorrect decisions and/or responses, and distrust in the crash warning system (CWS).  Furthermore, they may increase reaction time to true warnings.[26]

61.     Regarding audible warnings, the Guidance states that drivers will respond quicker if they perceive a higher degree of urgency, but "signals that are perceived as more urgent than is warranted by the situation can result in confusion, distraction, or inappropriate responses, such as overly-aggressive or startle responses."[27]

62.     The Guidance also notes that even simple visual displays should be designed to minimize glare because "light emanating from displays can be glaring at night causing discomfort, or in some conditions, reduced visibility of the external driving environment."[28]

63.     Little research has been conducted on the effects of vehicle interior lighting on drivers at night because the lights are intended for use when the vehicle is stationary.  A 1985 study found that even the standard map light reduced forward visibility by 10 to 20 percent.[29] Additionally, a 2007 study found that interior light reflections off windows makes it more difficult for drivers to detect pedestrians.[30]

64.     Despite the lack of empirical research, automotive safety experts have recognized the intrinsic danger of illuminating the interior cabin while driving at night.  A paper presented at NHTSA's 16th Enhanced Safety of Vehicles Conference in 1998 about how vision interacts with headlights noted:

---

[26]     NHTSA, Report No. DOT HS 812 360, Human Factors Design Guidance for Driver-Vehicle Interfaces (2016), at 4-2.

[27]     *Id.* at 7-5.

[28]     *Id.* at 6-14.

[29]     P. L. Olson, The effect of vehicle interior lighting systems on driver sight distance, Technical Report No. UMTRI-85-31, Univ. of Mich. Transp. Research Inst. (1985).

[30]     Joel M. Devonshire & Michael J. Flannagan, Effects of Automotive Interior Lighting on Driver Vision, Univ. of Mich. Transp. Research Inst., Technical Report No. UMTRI-2007-1 (2007).

00122394

BLOOD HURST & O'REARDON, LLP

BLOOD HURST & O'REARDON, LLP

1
2
3

Every driver is familiar with the effect of overly bright interior lighting distracting one's attention from what is going on outside the car at night. This effect is added to the reduction in object visibility resulting from diminished contrast.[31]

4

**C.     Plaintiff's Experience with His Ford Vehicle**

5
6
7
8

65.     David Baranco resides in San Rafael, California.  He owns a 2013 Ford Edge which he purchased in Santa Clara, California, from a private party in or around May 2016. Part of the purchase price was paid to the private party, and part was paid to Ford Motor Company in order to pay off the loan on the vehicle held by Ford Motor Company.

9
10
11
12
13
14
15
16
17
18
19

66.     Within a week of his purchase, Mr. Baranco identified the door ajar defect. Even with the doors firmly closed, the defect manifests by a distracting beeping sound, the display alternately flashes "door ajar" and "shift to park," the interior lights come on and stay on, and the doors cannot be locked from the inside (not even manually).  Further, when the car is parked and turned off, the interior lights may remain on, running down the battery.  The interior lights remaining on also reduce the driver's visibility, especially at night, and make it difficult and dangerous to pull into traffic or to reverse.  Plaintiff Baranco drives extra distances as needed to find night time parking that does not require him to reverse the vehicle. He has had a collision and close calls while reversing, which collision caused his insurance premiums to increase.  With the interior lights severely impacting use of the mirrors, he gets in and out of his vehicle multiple times to check for obstructions while reversing.

20
21

67.     Mr. Baranco contacted Ford on three occasions and requested that Ford repair the door ajar defect.  Ford refused each time.

22

**CLASS ACTION ALLEGATIONS**

23
24

68.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a proposed class defined as:

25

///

26

///

27
28

[31]     Burkard Wördenweber & Nils Labahn, Headlamp-Based Vision System and Vision Task, NHTSA 16th Enhanced Safety of Vehicles Conference, Paper No. 98-S2-P-19 (1998), at 517.

Case No. 3:17-cv-03580
**CLASS ACTION COMPLAINT**
00122394

All persons, entities or organizations who, at any time as of the entry of the Preliminary Approval Order, own or owned, purchase(d) or lease(d) Subject Vehicles distributed for sale or lease in any of the fifty States, the District of Columbia, Puerto Rico, and all other United States territories and possessions.

Excluded from the Class are: (a) Ford and Lincoln, their officers, directors, and employees; their affiliates and affiliates' officers, directors, and employees; their distributors and distributors' officers, directors, and employees; and Ford and Lincoln Dealers and Ford and Lincoln Dealers' officers and directors; (b) Plaintiff's Counsel; (c) judicial officers and their immediate family members and associated court staff assigned to this case; and (d) persons or entities who or which timely and properly excluded themselves from the Class.

69.    Certification of Plaintiff's claims for classwide treatment is appropriate because Plaintiff can prove the elements of his claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

70.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The Class consists of approximately a million people.  Therefore, the Class is so numerous that joinder of all members would be impracticable.  The sheer number of Class Members makes joinder of all members impracticable.

71.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact that predominate over any questions affecting individual Class Members, including:

a.    whether the Subject Vehicles are defective;

b.    whether the Subject Vehicles' defects constitute a safety risk;

c.    whether Ford and Lincoln misrepresented the standard, quality, and characteristics of the Subject Vehicles;

d.    whether Ford and Lincoln's misrepresentations regarding the standard, quality, and characteristics of the Subject Vehicles were likely to mislead reasonable consumers;

///

///

BLOOD HURST & O'REARDON, LLP

00122394

BLOOD HURST & O'REARDON, LLP

e.    whether Ford and Lincoln's omission that the "door ajar" warnings on the Subject Vehicles were faulty was a material fact that a reasonable consumer would be expected to rely on when deciding whether to purchase a vehicle;

f.    whether Plaintiff and the other Class Members have been damaged and, if so, the extent of such damages; and

g.    whether Plaintiff and the other Class Members are entitled to equitable relief, including, but not limited to, restitution and injunctive relief.

72.    Ford and Lincoln engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of the other Class Members.  Similar or identical statutory and common law violations, business practices, and injuries are involved.  Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

73.    **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other Class Members because, among other things, Plaintiff and the other Class Members were injured through the substantially uniform misconduct described above.  Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class Members, and no defense is available to Ford or Lincoln that is unique to any one plaintiff.

74.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class Members.  Additionally, Plaintiff has retained counsel competent and experienced in complex class action litigation.  Thus, the Class's interests will be fairly and adequately protected by Plaintiff and his counsel.

75.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action.  The damages, harm, or other financial detriment suffered individually by Plaintiff

and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Ford and Lincoln, making it impracticable for Class Members to individually seek redress for Defendants' wrongful conduct.  Even if Class Members could afford individual litigation, the court system should not be forced to shoulder such inefficiency.  Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.   By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I

### VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT

76.    Plaintiff repeats and realleges all other paragraphs as if fully set forth herein.

77.    Ford and Lincoln are each a "person," under Cal. Civ. Code §1761(c).

78.    Plaintiff and each of the Class Members is a "consumer," as defined by Cal. Civ. Code §1761(d), because they purchased or leased one or more Subject Vehicles.

79.    Defendants' conduct, as described herein, in misrepresenting in the Subject Vehicles' manuals that the Subject Vehicles' warnings and alarms will sound only if a vehicle door is open, and omitting the fact that they manufactured the Subject Vehicles with a uniform defect within the door latch switch that can cause unwarranted "door ajar" warnings and other related problems, violates the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§1750, *et seq*.  Specifically, Defendants violated the CLRA by misrepresenting and omitting material facts regarding the Subject Vehicles' door warnings, and by engaging in the following practices proscribed by Civil Code §1770(a) in transactions that were intended to result in, and did result in, the sale of the product:

a.    representing that the Subject Vehicles have approval, characteristics, ingredients, uses, benefits, or quantities which they do not have;

BLOOD HURST & O'REARDON, LLP

00122394

b.    representing that the Subject Vehicles are of a particular standard, quality, or grade if they are of another;

c.    advertising the Subject Vehicles with intent not to sell them as advertised; and

d.    representing that the Subject Vehicles have been supplied in accordance with previous representations when they have not.

80.    Defendants violated the Act by selling Subject Vehicles that they knew possessed uniform defects that caused the Subject Vehicles issue a "door ajar" warning when the doors were closed, and exposed the public to an unreasonable safety risk.  Defendants omitted from Plaintiff and the other Class Members, to whom it had a duty to disclose, the material fact that the Subject Vehicles were sold with defective door latch switches that issued false door ajar warnings and caused the doors to remain unlocked and the interior lights to remain on.  This is a fact that a reasonable consumer would consider important in selecting a vehicle to purchase or lease.

81.    Ford's Technical Service Bulletins were false and deceptive because they recommended a "fix" – cleaning the electrical connector – that did not resolve the false "door ajar" warning defect. The Technical Service Bulletins instituted by Ford were not adequate and the Subject Vehicles are still defective.

82.    Pursuant to Civil Code §1782(d), Plaintiff, individually and on behalf of the other members of the Class, seeks a Court order enjoining the above-described wrongful acts and practices of Defendants, ordering Defendants to extend repair remedies to all Class Members who experience faulty door ajar warnings, and awarding restitution and disgorgement.

83.    Pursuant to §1782 of the Act, Plaintiff notified Defendants in writing by certified mail of the particular violations of §1770 of the Act and demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendants' intent to so act.  A copy of the letter is attached hereto as Exhibit A. If Defendants fail to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written

BLOOD HURST & O'REARDON, LLP

1    notice pursuant to §1782 of the Act, Plaintiff will amend this complaint to add claims for

2    damages, as appropriate.

3        84.    Defendants' conduct is fraudulent, wanton, and malicious.

4        85.    Pursuant to §1782(d) of the Act, attached hereto as Exhibit B is the affidavit

5    showing that this action has been commenced in the proper forum.

6                              **COUNT II**

7        **VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**

8        86.    Plaintiff repeats and realleges all other paragraphs as if fully set forth herein.

9        87.    The Unfair Competition Law, Business & Professions Code §§17200, *et seq*.

10   ("UCL"), and similar laws in other states, prohibits any "unlawful," "fraudulent," or "unfair"

11   business act or practice and any false or misleading advertising.  In the course of conducting

12   business, Defendants committed "unlawful" business practices by, among other things, making

13   the representations and omissions of material facts, as set forth more fully herein, and violating

14   Civil Code §§1572, 1573, 1709, 1711, 1770(a)(5), (7), (9), and (16), and Business &

15   Professions Code §§17200, *et seq*., 17500, *et seq.*, and the common law.  Plaintiff, individually

16   and on behalf of the other Class Members, reserves the right to allege other violations of the

17   law, which constitute other unlawful business acts or practices.  Such conduct is ongoing and

18   continues to this date.

19       88.    In the course of conducting business, Defendants committed "unfair" business

20   practices by, among other things, making the representations and omissions of material facts

21   that the Subject Vehicles' door warnings and alarms will sound only if a vehicle door is open,

22   as alleged.  There is no societal benefit from such false and misleading representations and

23   omissions – only harm.  While Plaintiff and the other Class Members were harmed by this

24   conduct, Defendants were unjustly enriched.  As a result, Defendants' conduct is "unfair," as it

25   has offended an established public policy.  Further, Defendants engaged in immoral, unethical,

26   oppressive, and unscrupulous activities that are substantially injurious to consumers.

27   ///

28   ///

BLOOD HURST & O'REARDON, LLP

00122394

89.     Further, as set forth in this Complaint, Plaintiff alleges violations of consumer protection, unfair competition, and truth in advertising laws in California and other states, resulting in harm to consumers.  Defendants' acts and omissions also violate and offend the public policy against engaging in false and misleading advertising, unfair competition, and deceptive conduct towards consumers.  This conduct constitutes violations of the unfair prong of Business & Professions Code §§17200, *et seq*.  There were reasonably available alternatives to further Defendants' legitimate business interests other than the conduct described herein.

90.     Business & Professions Code §§17200, *et seq.*, also prohibits any "fraudulent business act or practice."   In the course of conducting business, Defendants committed "fraudulent business act[s] or practices" by among other things, prominently making the representations (which also constitute advertising within the meaning of §17200) and omissions of material facts regarding the safety, characteristics, and production quality of the Subject Vehicles.

91.     Defendants' actions, claims, omissions, and misleading statements, as more fully set forth above, were also false, misleading, and likely to deceive the consuming public within the meaning of Business & Professions Code §§17200, *et seq*.

92.     Plaintiff has in fact been deceived as a result of his reliance on Defendants' material representations and omissions, which are described above.  Plaintiff has suffered injury in fact and lost money as a result of purchasing one of the deceptively advertised Subject Vehicles by paying more than he should have and expending time, effort, and money to attempt to repair the door latch switch only to be told repair was not possible.

93.     Unless restrained and enjoined, Defendants will continue to engage in the above-described conduct.  Accordingly, injunctive relief is appropriate.  Plaintiff, on behalf of himself, all others similarly situated, and the general public, seeks restitution from Defendants of all money obtained from Plaintiff and the other members of the Class collected as a result of unfair competition, an injunction prohibiting Defendants from continuing such practices, corrective advertising, and all other relief this Court deems appropriate, consistent with Business & Professions Code §17203.

BLOOD HURST & O'REARDON, LLP

00122394

1

**COUNT III**

2

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

3       94.     Plaintiff repeats and realleges all other paragraphs as if fully set forth herein.

4       95.     Ford and Lincoln are and were, at all relevant times, merchants with respect to

5   motor vehicles under Cal. Com. Code §2104.

6       96.     A warranty that the Subject Vehicles were in merchantable condition was

7   implied by law in the instant transaction, pursuant to Cal. Com. Code §2314.

8       97.     Plaintiff and the other Class Members purchased the Subject Vehicles that were

9   manufactured and sold by Defendants in consumer transactions.  Defendants were and are in

10  the business of selling vehicles and were and are merchants of the Subject Vehicles.

11      98.     The Subject Vehicles, when sold and at all times thereafter, were not in

12  merchantable condition and were not fit for the ordinary purpose for which cars are used.  The

13  Subject Vehicles left Defendants' possession and control equipped with defective door latch

14  switches that rendered them at all times thereafter unmerchantable, unfit for ordinary use,

15  unsafe, and a threat to public safety.  Plaintiff and the other Class Members used their Subject

16  Vehicles in the normal and ordinary manner for which the Subject Vehicles were designed and

17  advertised.

18      99.     Ford and Lincoln knew before the time of sale to Plaintiff or earlier, that the

19  Subject Vehicles were produced with defective door latch switches that would issue false

20  "door ajar" warnings and keep the doors from locking and the lights on, rendering the Subject

21  Vehicles unfit for their ordinary purpose.

22      100.    Despite Plaintiff's and the other Class Members' normal and ordinary use,

23  maintenance, and upkeep, the door latch switches of the Subject Vehicles experienced faulty

24  "door ajar" alarms and warnings lights as a result of a manufacturing or design defect that

25  existed at the time Defendants transferred the Subject Vehicles from their possession or

26  control.  The defect rendered the Subject Vehicles unfit for their ordinary use and incapable of

27  performing the tasks they were designed, advertised, and sold to perform.

28

BLOOD HURST & O'REARDON, LLP

00122394

27                                    Case No. 3:17-cv-03580

**CLASS ACTION COMPLAINT**

1    101.    As a result, the Subject Vehicles' door latch switches are not of fair average

2    quality.  Nor would they pass without objection in the automotive industry.  The fact that the

3    false warnings make it impossible to lock the vehicle's doors while the vehicle is in operation

4    renders the vehicle unsafe to drive and requires repairs of the Subject Vehicle's door-locking

5    mechanism before safe, ordinary use can resume.

6    102.    All conditions precedent have occurred or been performed.

7    103.    Defendants have actual notice of their breach of warranty.  Through consumer

8    complaints, Defendants learned that the defect, the existence and ubiquity of which it knew

9    much earlier, has been the subject of publicized consumer disputes nationwide.  Their

10   implementation of the Technical Service Bulletins directed to the Subject Vehicles shows

11   actual notice.

12   104.    Defendants' warranty disclaimers, exclusions, and limitations, to the extent that

13   they may be argued to apply, were, at the time of sale, and continue to be unconscionable and

14   unenforceable to disclaim liability for a known, latent defect.  Defendants knew when they

15   first made these warranties and their limitations that the defect existed and that the warranties

16   might expire before a reasonable consumer would notice or observe the defect.  Defendants

17   also failed to take necessary actions to adequately disclose or cure the defect after the

18   existence of the defect came to the public's attention and sat on their reasonable opportunity to

19   cure or remedy the defect, their breaches of warranty, and consumers' losses.  Under these

20   circumstances, it would be futile to enforce any informal resolution procedures or give

21   Defendants any more time to cure the defect, their breaches of warranty, or otherwise attempt

22   to resolve or address Plaintiff's and the other Class Members' claims.

23   105.    As a direct and foreseeable result of the defect in the Subject Vehicles' door

24   latch switches, Plaintiff and the other Class Members suffered diminution in the value of the

25   Subject Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their

26   defective Subject Vehicles, costs associated with arranging and obtaining alternative means of

27   transportation, and other incidental and consequential damages recoverable under the law.

28

BLOOD HURST & O'REARDON, LLP

106.   Plaintiff and Class Members have had sufficient direct dealings with either Ford or Lincoln or their agents (dealerships) to establish privity of contract between Plaintiff and the Class Members.  Notwithstanding this, privity is not required in this case because Plaintiff and Class Members are intended third-party beneficiaries of contracts between Ford and Lincoln and their dealers; specifically, they are the intended beneficiaries of Ford and Lincoln's implied warranties.  The dealers were not intended to be the ultimate consumers of the Subject Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.  Finally, privity is also not required because Plaintiff's and Class Members' Subject Vehicles are inherently dangerous due to the aforementioned defects and nonconformities.

**COUNT IV**

**BREACH OF EXPRESS WARRANTY**

107.   Plaintiff repeats and realleges all other paragraphs as if fully set forth herein.

108.   Ford and Lincoln are and were, at all relevant times, merchants with respect to motor vehicles under Cal. Com. Code §2104.

109.   When marketing, distributing, and selling the Subject Vehicles, Ford and Lincoln expressly warranted that it provided 36 months or 36,000 miles of comprehensive coverage, whichever occurred first, during which time Ford and Lincoln represented they would cover the cost of any repair or replacement necessary due to a defect in materials or workmanship relating to the Subject Vehicles.

110.   Ford and Lincoln knew that the door latch switches on the Subject Vehicles were defective at the time of sale.  Indeed, Defendants were well aware of the faulty door warnings in the Subject Vehicles.  Defendants breached express warranties when Defendants delivered the Subject Vehicles that did not conform to their affirmations of fact and industry standards for door-lock mechanisms.

///

///

///

BLOOD HURST & O'REARDON, LLP

00122394

111.    Ford and Lincoln breached the express warranty to repair the defects in the Subject Vehicles, because they failed to adequately repair the door latch switches in the Subject Vehicles to ensure such vehicles did not issue false "door ajar" warnings and refrain from locking the doors.

112.    Despite Defendants' knowledge of the problem and opportunity to cure (as evidenced by the Technical Service Bulletins), Defendants failed to notify Plaintiff and the other members of the Class of the defect and to adequately repair, at no charge to the Class, the defective door-lock mechanisms.

113.    All conditions precedent have occurred or been performed.

114.    Defendants had actual notice of their breaches of express warranty.  Through consumer complaints Defendants learned that the defect, the existence and ubiquity of which it knew much earlier, was the subject of consumer disputes nationwide.  Their implementation of the Technical Service Bulletins directed at the Subject Vehicles shows actual notice.

115.    Defendants' warranty disclaimers, exclusions, and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be unconscionable and unenforceable to disclaim liability for a known, latent defect.  Defendants knew when they first made these warranties and their limitations that the defect existed and that the warranties might expire before a reasonable consumer would notice or observe the defect.  Defendants also failed to take any actions to adequately disclose or cure the defect after the existence of the defect came to the public's attention and sat on their reasonable opportunity to cure or remedy the defect, their breaches of warranty, and consumers' losses.  Under these circumstances, it would be futile to enforce any informal resolution procedures or give Defendants any more time to cure the defect, their breaches of warranty, or otherwise attempt to resolve or address Plaintiff's and the other Class Members' claims.

116.    Plaintiff and the other Class Members were damaged as a result of Ford and Lincoln's breach of express warranty because the door latch switches on the Subject Vehicles are defective, compromising the safety of the vehicles' passengers, and requiring repair of the Subject Vehicles' door-lock mechanisms.

117.   As a direct and foreseeable result of Defendants' failure to repair the Subject Vehicles' door latch switches, Plaintiff and the other Class Members suffered diminution in the value of the Subject Vehicles, out-of-pocket losses related to the repairing, maintaining, and servicing their defective Subject Vehicles, costs associated with arranging other forms of transportation, and other incidental and consequential damages recoverable under the law.

## COUNT V

## DECLARATORY RELIEF

**Claim Brought on Behalf of the Declaratory Relief Class**

118.   Plaintiff repeats and realleges all paragraphs as if fully set forth herein.

119.   Pursuant to 28 U.S.C. §2201, the Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

120.   Defendants marketed, distributed, and sold the Subject Vehicles equipped with door latch switches prone to issuing false "door ajar" warnings on account of Defendants' failure to design and manufacture a door-lock mechanism without defects.

121.   Accordingly, Plaintiff seeks entry of the following declarations: (1) model years 2011 to 2013 Edge Vehicles, 2013 Flex Vehicles, 2013 to 2014 Explorer Vehicles, 2011 to 2013 MKX Vehicles, and 2013 MKT Vehicles, contain faulty door latch switches and are defective; (2) all persons who purchased model years 2011 to 2013 Edge Vehicles, 2013 Flex Vehicles, 2013 to 2014 Explorer Vehicles, 2011 to 2013 MKX Vehicles, and 2013 MKT Vehicles, are to be provided the best practicable notice of the defect, which cost shall be borne by Defendants; and (3) Defendants must establish an inspection, repair, and replacement program and protocol and notify Class Members of such program, pursuant to which Defendants, including their authorized representatives, and at no cost to Class Members, will inspect, upon request, Class Members' Subject Vehicles for defective door latch switches and repair or replace the door latch switches on the Subject Vehicles that have experienced false "door ajar" warnings.

BLOOD HURST & O'REARDON, LLP

00122394

BLOOD HURST & O'REARDON, LLP

**REQUESTS FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court enter an Order:

    a.    certifying the Class under Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), as requested herein;

    b.    appointing Plaintiff as Class Representative and undersigned counsel as Class Counsel;

    c.    finding that Ford and Lincoln engaged in the unlawful conduct as alleged herein;

    d.    awarding Plaintiff and the other Class Members damages;

    e.    awarding Plaintiff and the other Class Members restitution and disgorgement of monies Defendants acquired through their violations of the law;

    f.    awarding Plaintiff and the other Class Members injunctive and declaratory relief;

    g.    requiring Ford and Lincoln to repair or replace the door latch switches on the Subject Vehicles;

    h.    awarding Plaintiff and the other Class Members pre-judgment and post-judgment interest on all amounts awarded;

    i.    awarding Plaintiff and the other Class Members reasonable attorneys' fees, costs, and expenses; and

    j.    granting such other relief as the Court deems just and appropriate.

///
///
///
///
///
///
///

Case No. 3:17-cv-03580
CLASS ACTION COMPLAINT

00122394

1

**JURY TRIAL DEMAND**

2          Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on

3    all claims in this Class Action Complaint so triable.

4                                              Respectfully submitted,

5    Dated: June 21, 2017                      BLOOD HURST & O'REARDON, LLP
                                               TIMOTHY G. BLOOD (149343)
6                                              LESLIE E. HURST (178432)
                                               CAMILLE S. BASS (297609)
7
                                               By:        *s/ Timothy G. Blood*
8                                                    TIMOTHY G. BLOOD

9                                              701 B Street, Suite 1700
                                               San Diego, CA  92101
10                                             Tel: 619/338-1100
                                               619/338-1101 (fax)
11                                             tblood@bholaw.com
                                               lhurst@bholaw.com
12                                             cbass@bholaw.com

13                                             THE DAVENPORT LAW FIRM LLC
                                               COURTNEY L. DAVENPORT
14                                             18805 Porterfield Way
                                               Germantown, MD  20874
15                                             Tel: 703/901-1660
                                               courtney@thedavenportlawfirm.com
16
                                               *Attorneys for Plaintiff and the Class*
17

18

19

20

21

22

23

24

25

26

27

28

BLOOD HURST & O'REARDON, LLP

00122394

33

CLASS ACTION COMPLAINT

Case No. 3:17-cv-03580