UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DAVID BARANCO, et al.,

       Plaintiffs,

    v.

FORD MOTOR COMPANY, et al.,

       Defendants.

Case No. 17-cv-03580-EMC

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS**

Docket No. 36

Plaintiffs allege that Ford manufactured vehicles with defective door latches which permit the door sensors to become contaminated over time, and thus to falsely signal that a door is not closed when in fact it is, posing a variety of safety risks. Plaintiffs bring causes of action for breach of express and implied warranty and under consumer fraud laws for failure to disclose a material defect. Defendant moves to dismiss all claims. As explained below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion.

## I.   FACTUAL BACKGROUND

Plaintiffs allege that certain Ford and Lincoln vehicles contain defects in the door latch assembly that cause certain sensors to become contaminated over time and thus to falsely signal that a door is open when it is in fact closed. *See* First Amended Complaint ("FAC"), Docket No. 18, ¶¶ 1-14. The affected vehicles are 2011-2016 Ford Edges, 2012-2014 Ford Flexes, 20131-2014 Ford Explorers, 2011-2013 Lincoln MKXs, and 2013 Lincoln MKTs (the "Subject Vehicles"). FAC ¶ 1.

The defect is inherent to the vehicles in question. In particular, the door latch assembly uses an integral electro-mechanical switch (i.e., a sensor) that detects whether the door is open or closed based on the voltage signal received from the switch. FAC ¶ 35. The vehicles contain a

Body Control Module ("BCM") that monitors the voltage from the door latch switch to determine whether the door is open or closed. *Id.* ¶ 36. When the switch indicates that the door is closed, the BCM sends a "wetting current" through the electrical connector from the door latch switch to the BCM that is supposed to keep the sensor clean. *Id.* A "wetting current" is "the minimum electric current needed to flow through an electrical contact to break through the surface film resistance on the contact" and to prevent a film of oxidation that may occur from humidity and exposure to moisture. *Id.* The defect arises from the allegation that the "wetting current" used by the Subject Vehicles is too low to prevent such surface film from accumulating, and thus too low to keep the sensor clean. *Id.* ¶ 48. In particular, beginning in 2011, the BCM was modified to "reduc[e] the wetting current sent out to clean the switch contacts by more than 75%," which Ford admits "is not sufficient to keep the switch contacts clean and contamination build up [then] causes them to fail." *Id.* ¶ 49.

As the contamination progresses, it interferes with the accuracy of the voltage readings, falsely indicating to the BCM that a door is open when it is in fact closed. This "triggers an audible warning, activates a visual warning on the instrument panel, and sends out a visual intermittent 'shift to park' message" because the faulty sensor causes the vehicle computer system to mistakenly believe the vehicle has stopped. *Id.* ¶ 48. In addition, "all interior lights are illuminated and the doors are unlocked, and they cannot then be manually relocked." *Id.* This "can continue for several hours, even after the vehicle is parked and turned off, draining the battery and potentially stranding vehicle occupants." *Id.* Furthermore, the defect causes the vehicle's autolock feature to fail. *Id.* ¶ 37. The autolock feature "will lock all the doors when: all the doors are closed, the ignition is on, you shift into any gear putting your vehicle in motion, and your vehicle reaches a speed greater than 12mph" as well as when "you open then close any door while the ignition is on and the vehicle speed is 9mph (15 km/h) or lower, and your vehicle then reaches a speed greater than 12 mph." *Id.*

Plaintiffs allege that Ford knew about the defect. In 2014, Ford issued a Technical Service Bulletin ("TSB") to dealerships describing the defect in detail and its cause. Ford recommended dealers use a special tool to perform a fix that would "clean" the sensors, a procedure known as

"burning the wires." *Id.* ¶ 42. Plaintiffs describe this "fix" as a "work-around that did not repair the underlying defect but temporarily stopped it from manifesting for a short period of time." *Id.* ¶ 43. Allegedly, this allowed Ford to "give the false appearance of repairing the defect, and doing so at a lower repair cost and often during the warranty period." *Id.* Because it was a temporary fix, however, many customers reported recurrence of the defect, typically after the warranty period, at which point Ford would recommend that drivers "replace the entire door watch assembly at a significant cost to vehicle owners and lessees." *Id.* Plaintiffs suggest that Ford intentionally used only a less expensive temporary fix during the warranty period in order to shift the cost of repairing the underlying defect onto consumers after expiration of the warranty. *Id.* This faulty repair process—which temporarily covered up the symptoms but failed to repair the defect—is the basis for Plaintiffs' claims for breach of express warranty. (All the vehicles are subject to a three year or 36,000 mile "Bumper to Bumper" warranty. *Id.* ¶ 41.)

The defect has affected a significant number of vehicles. Plaintiffs allege that "[o]ver 2,670 people have reported false door ajar problems to NHTSA and Ford and more than 33,000 warranty claims [for the problem] ha[ve] been submitted." *Id.* ¶ 50.

Plaintiffs claim the door latch defect gives rise to various safety risks. Various studies have shown that having a door which is locked and remains closed during an accident improves a vehicle's crashworthiness and reduces the likelihood of an occupant being ejected in a crash. *See* FAC ¶¶ 60-63. Automatic door locks "improve the likelihood that doors will stay closed in the event of an accident, retaining the structural integrity of the vehicle and lowering the chance of occupant ejection." *Id.* ¶ 64. The National Highway Transportation Safety Administration ("NHTSA") "has repeatedly urged parents to purchase vehicles with automatic door locks." *Id.* ¶ 66. The inability to lock the doors while in motion places drivers at risk because it increases the risk of carjacking. *Id.* ¶¶ 68, 70-71. In addition, it permits passengers, such as young children, to open the doors while in motion because neither the autolocking system nor manual override permit them to be locked. *Id.* ¶ 67. At least 14 consumers reported doors opening while in motion. *Id.* ¶ 51.

Plaintiffs also allege that the audio and visual signals are allegedly distracting to drivers,

causing some to pull over and check the doors, placing them at risk of being struck by vehicles on the roadway. *See* FAC ¶¶ 72-77. In particular, when the interior dome lights remain on, especially at night, there is a "reduction in object visibility resulting from diminished contrast" as well as a distraction "from what is going on outside the car at night." *Id.* ¶ 77.

Finally, because the lights will not turn off when the vehicle thinks the doors are open, even when the vehicle is off or parked, the battery may drain and has drained for several Plaintiffs and consumers. *See, e.g.*, FAC ¶ 54.

Plaintiffs allege violations of various state consumer fraud laws, breach of implied warranty, and breach of express warranty. Plaintiffs, their vehicles, and their states are listed in the chart below.

| Name | Vehicle | State | Purchase Date |
|------|---------|-------|---------------|
| David Baranco | 2013 Ford Edge | CA | May 2016 |
| James Abbitt | 2013 Ford Flex SE | NC | August 2013 |
| Harriet Abruscato | 2013 Ford Edge | IL | N/A |
| Donald Brown | 2013 Ford Edge | NH | Early 2014 |
| Daniel Caron | 2013 Ford Flex | NM | August 2013 |
| Anita Farrell | 2012 Ford Edge | FL | November 2013 |
| John Furno | 2013 Ford Edge | IL | January 2014 |
| James Jenkin | 2013 Ford Edge | NY | August 2014 |
| Roger Kinnunen | 2011 Ford Edge | MI | July 2011 |
| Gary Kubber | 2013 Ford Edge | NY | May 2014 |
| Malisa Nicolau | 2013 Ford Edge | CA | June 2015 |

In support of its motion, Ford also submits the Closing Resume from the Office of Defect Investigations in the National Highway Transportation Safety Administration (NHTSA), which summarizes its investigations and findings related to the door lock defect.[1] *See* Docket No. 36-2 ("NHTSA Findings"). The NHTSA Findings indicate that the NHTSA opened an investigation in

---

[1] Ford requests the Court take judicial notice of the NHTSA findings letter. Plaintiffs have not opposed the request. The Court **GRANTS** the request and take judicial notice of the letter insofar as it reflects the findings of the NHTSA, but not for the truth of the matters asserted therein. *See Mack v. S. Bay Beer Distribs.*, 798 F.2d 1279, 1282 (9th Cir. 1986) (a court may take judicial notice of "records and reports of administrative bodies"); *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales, Practices & Prods. Liab. Litig.*, 890 F.Supp.2d 1210, 1216 n.2 (C.D. Cal. 2011) (granting request for judicial notice of NHTSA's closing resume).

4

September 28, 2016 and closed it on March 20, 2017 into a total of 1,983 complaints related to door ajar warning lights in 2011-2013 Ford Edge vehicles. Reported safety consequences included "doors opening while driving (because doors were initially not latched properly), doors cannot be locked while driving, and the interior dome lights staying on continuously." NHTSA Findings at 1. The failures were caused by the same defect described in Plaintiffs' complaint. *Id.* The NHTSA identified 14 complaints in which a door opened while driving, 12 out of 14 involving an incident where "an occupant of the vehicle (often a child) opened a passenger door because the doors were not locked." *Id.* No accidents were reported. The NHTSA concluded:

> After reviewing all available data, an unreasonable risk to motor vehicle safety has not been identified. The door latches themselves continue to function properly, remaining securely latched until acted upon by a driver or passenger. Child safety locks on the rear doors continue to function properly and can be used to prevent the rear doors from opening via the inside door handles. Vehicle crashworthiness is not affected by the lock condition of the doors and all active safety systems continue to function normally even if the vehicle BCM believes one or more doors is open. In addition, no accidents or accident related injuries have been reported.
>
> A safety-related defect trend has not been identified at this time and further use of agency resources does not appear to be warranted. Accordingly, the investigation is closed. The closing of this investigation does not constitute a finding by NHTSA that a safety-related defect does not exist.

*Id.* at 2.

## II.  LEGAL STANDARD

In considering a Rule 12(b)(6) motion to dismiss, a court must take all allegations of fact as true and construe them in the light most favorable to the nonmoving party, although "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer,* 568 F.3d 1063, 1067 (9th Cir. 2009). While "a complaint need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *see also Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167

L.Ed.2d 929 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than sheer possibility that a defendant acted unlawfully." *Id.*

Claims sounding in fraud or mistake are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which requires that a plaintiff alleging fraud "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1124 (9th Cir. 2009) (holding that nondisclosure claims sound in fraud and are subject to Rule 9(b)). To satisfy the heightened standard under Rule 9(b), the allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir. 1985). The plaintiff must set forth "what is false or misleading about a statement, and why it is false." *In re Glenfed, Inc. Sec. Litig.,* 42 F.3d 1541, 1548 (9th Cir.1994) (en banc), *superseded by statute on other grounds as stated in Ronconi v. Larkin,* 253 F.3d 423, 429 n. 6 (9th Cir. 2001).

## III.   DISCUSSION

A.   Statutory Consumer Fraud Claims

Plaintiffs bring fraud and consumer protection claims under the laws of several states premised on Ford's failure to inform Plaintiffs that the vehicles "were sold with defective door latch switches that issued false door ajar warnings and caused the doors to remain unlocked and the interior lights to remain on." FAC ¶ 132.

In general, a claim based on failure to disclose information requires a plaintiff to demonstrate that the defendant had a duty to disclose such information. *See Falk v. Gen. Motors Corp.*, 494 F.Supp.2d 1088, 1094 (N.D. Cal. 2007). Such a duty arises "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material fact." *Id.* (quotation and citation omitted). Here, Plaintiffs' claims are premised on the notion that the defect was material, and that Ford had exclusive knowledge of the defect or actively concealed it from consumers.

The standard for materiality of the defect depends on whether it arises in-warranty or post-warranty. "[A] manufacturer has a duty to disclose any defects that fall within the warranty period, whether relating to safety or to costly repairs, that would have caused the consumer to not purchase the car if they had been disclosed." *Apodaca v. Whirlpool Corp.*, No. 13-00725 JVS (ANx), 2013 WL 6477821, at *7 (C.D. Cal. Nov. 8, 2013) (quotation omitted). If the defect arises outside of the warranty period, however, then the manufacturer only has a duty to disclose "safety issues." *Id.* The purpose of this limitation in the post-warranty context is to ensure that durational limits on express warranties are not rendered meaningless. To allege a safety issue for purposes of a post-warranty claim, "a party must allege (1) the existence of a design defect; (2) the existence of an unreasonable safety hazard; (3) a causal connection between the alleged defect and the alleged safety hazard; and that the manufacturer knew of the defect at the time a sale was made." *Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1025 (9th Cir. 2017) (citation and quotation omitted).

Both in-warranty and post-warranty claims also require a plaintiff to demonstrate "actual reliance" on the purported omission. *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015). Actual reliance can be proved by showing that "had the omitted information been disclosed, one would have been aware of it and behaved differently." *Id.* As to the first sub-component of actual reliance, the Court may infer or presume that the plaintiff would have behaved differently if the omitted information was material. *Id.* As to the second sub-component, a plaintiff must show that they "would have been aware of a disclosure by [the defendant]." *Id.* at 1226.

Ford does not contest the existence of a defect nor pre-sale knowledge of the defect. Rather, Ford argues that it may not be liable unless Plaintiffs allege that Ford subjectively believed that the defect was an unreasonable safety hazard and failed to disclose that belief, or that its conclusion that no defect requiring a recall under the NHTSA standards was unreasonable. Ford also disputes whether the safety hazard was unreasonable, arguing Plaintiffs must identify a specific safety standard which the defect violated. Ford also argues that, in any case, any safety issue could be mitigated through prompt action to address the issue by the driver and therefore

was not unreasonable.  Finally, Ford argues Plaintiffs have failed to allege that the defect was material because they do not allege that other vehicles were less likely to experience the same or comparable defects.  The Court analyzes each argument in turn.

      1.    <u>Plaintiffs Only Need to Plead Ford's Knowledge of a Defect, Not Knowledge of a Safety Risk</u>

As explained above, to demonstrate that Ford had a duty to disclose the defect, Plaintiffs must allege that Ford had "exclusive knowledge of material facts not known to the plaintiff." *Falk*, 494 F.Supp.2d at 1094.  The "material fact" alleged here is the door latch defect.  For purposes of their post-warranty claim, Plaintiffs must also demonstrate that the door latch defect posed an "unreasonable safety hazard." *Williams*, 851 F.3d at 1025.  To support that portion of their claim, Plaintiffs must allege that "the manufacturer [*i.e.*, Ford] knew of the defect at the time a sale was made." *Id.*

Ford has not challenged pre-sale knowledge of the door latch defect.  Instead, Ford argues that Plaintiffs must also demonstrate that it had pre-sale knowledge that the defect was safety-related.  Otherwise, according to Ford, its omission could not have been actionable for failure to disclose.  According to Ford, the omission would be actionable only if Plaintiffs could plead either that Ford had subjectively perceived a safety issue and opted not to disclose it, or that Ford's conclusion that no safety recall was required was unreasonable.

In other words, Ford argues that a plaintiff must plead not only knowledge of a defect, but also knowledge of the defect's materiality.  Ford cites no case-law endorsing that principle, however.  To the contrary, the cases only require knowledge of the defect. *See, e.g.*, *Williams*, 851 F.3d at 1025 (plaintiff must plead "the manufacturer knew of the defect at the time a sale was made"); *Falk*, 496 F.Supp.2d at 1095-96 (analyzing whether "GM had exclusive knowledge of the alleged defect" without reference to knowledge of safety ramifications); *Ehrlich v. BMW of N. Am., LLC*, 801 F.Supp.2d 908, 918-19 (C.D. Cal. 2010) (same); *MacDonald v. Ford Motor Co.*, 37 F.Supp.3d 1087, 1096-97 (N.D. Cal. 2014) (same); *Hardt v. Chrysler Grp., LLC*, 2015 WL 12683963, at *4-5 (C.D. Cal. Mar. 16, 2015) (same).  No case cited by the parties has held that the manufacturer must also be aware the defect carried safety implications (or was otherwise

material).  *See Williams*, 851 F.3d at 1025 (plaintiff must plead "the manufacturer knew of the *defect* at the time a sale was made" (emphasis added)).  While the fact of the safety implications may be a requisite element of the claim, Ford's specific *knowledge* of a safety implication is not.

Because Ford has not cited, and the Court has not located, any case that requires the manufacturer to be aware of a safety risk rather than the fact of the defect, the Court **DENIES** Ford's motion to dismiss on that basis.

### 2. Plaintiffs Do Not Need to Plead Non-compliance With a Specific Safety Standard

Ford also argues that Plaintiffs must plead that the door defect violated a particular safety or regulatory standard in order to show the safety hazard was "unreasonable" for post-warranty claims.  However, courts assess whether a safety risk is "unreasonable" from a reasonable consumer's perspective.  *See, e.g.*, *In re MyFord Touch Consumer Litig.*, 46 F.Supp.3d 936, 960 (N.D. Cal. 2014) ("[A] reasonable jury could find a safety concern here with respect to MFT that gives rise to a duty to disclose.").  This flows from the fact that an unreasonable safety risk is one type of "material" omission, and materiality is analyzed based on whether "a reasonable man would attach importance to [a fact's] existence or nonexistence in determining his choice of action in the transaction in question."  *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011) (quoting *In re Steroid Hormone Product Cases*, 181 Cal.App.4th 145, 157 (2010)), *abrogated on other grounds by Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  Thus, materiality—and therefore unreasonableness of a safety defect—is typically a question of fact reserved for a jury "unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it."  *Id.* (quotation and citation omitted).

The question need not turn on whether there was a violation of NHTSA's standards for vehicle recalls or any other specific safety standard, however.  While such a regulatory violation can conceivably constitute a *per se* unreasonable safety risk, such a regulatory violation is not a necessary condition to materiality.  *See, e.g.*, *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1221 (9th Cir. 2015) (permitting claim for fraudulent omission based on "alignment/geometry" defect causing premature tire wear; no safety regulation was allegedly breached); *MacDonald v. Ford*

*Motor Co.*, 37 F.Supp.3d 1087 (N.D. Cal. 2014) (permitting claim based on defective coolant pumps to proceed, but no safety regulation allegedly violated).

Ford fails to cite any persuasive case law to support its argument to the contrary. Ford cites only *Iannacchino v. Ford Motor Co.*, 888 N.E.2d 879 (Mass. 2008). In that case, the plaintiffs' theory of liability was that certain door latches failed to comply with a particular NHTSA safety regulation (known as "FMVSS 206"), even though the manufacturer had represented the vehicles as compliant with federal safety regulations. The Massachusetts Supreme Court held that "the plaintiffs' complaint does not adequately allege that their vehicles fail to comply with FMVSS 206," *id.* at 887, and so dismissed their state law claim for regulatory non-compliance. The plaintiffs also alleged that the vehicles were "defective," but their complaint merely "equate[d] the claimed defect with the plaintiffs' assertion of noncompliance with FMVSS 206." *Id.* Because the court held that "the complaint does not state an adequate claim of noncompliance with FMVSS 206, the[] intertwined assertions of 'defect' must also fail." *Id.* at 888. This is unlike the instant case where Plaintiffs' claim is not expressly tied to a particular regulatory violation. To the extent the plaintiffs in *Iannacchino* based their claim on a more general non-regulatory theory, the complaint was too conclusory. *See id.* ("Where, as in this case, there is no allegation that the plaintiffs – or indeed anyone else –have suffered personal injury or property damage, the complaint must identify a legally required standard that the vehicles were at least implicitly represented as meeting, but allegedly did not.").

In contrast, Plaintiffs' allegations of a defect in the instant case are not "conclusory" or "bare assertion[s]." Indeed, Ford itself has acknowledged that the product is defective in its 2014 TSB. Moreover, Plaintiffs *have* identified "a legally required standard," the one imposed by the common law: the vehicles should not have contained a defect posing "an unreasonable safety risk" under *Daniel* and *Williams*, as judged from a reasonable consumer's perspective.[2]

---

[2] The other two cases cited by Ford are inapposite. *See Tincher v. Omega Flex*, 104 A.3d 328, 384 (Pa. 2014) (discussing the standard for proving a defective condition in a strict products liability case and concluding it must be based either on consumer expectations or a risk-utility test); *Lassen v. Nissan N. Am., Inc.* 2016 U.S. Dist. LEXIS 139512, at *56 (C.D. Cal. Sep. 30, 2016) (refusing to import product liability defect standards into consumer fraud context and concluding that "[p]laintiffs have not articulated a precise legal theory of defect that accounts for

Finally, Ford argues that the NHTSA's conclusion to not issue a recall weighs against a finding of an unreasonable safety risk. Even assuming that the NHTSA's findings are properly considered on a motion to dismiss,[3] the NHTSA expressly stated that "[t]he closing of this investigation does *not* constitute a finding by NHTSA that a safety-related defect does not exist." NHTSA Findings at 2 (emphasis added). Thus, the NHTSA's findings do not contradict Plaintiffs' allegations. In any event, the evidentiary record in this case will likely be broader than that before the NHTSA. The NHTSA decision does not preclude a factual finding of an unreasonable safety risk.

The Court **DENIES** Ford's motion to dismiss based on Plaintiffs' failure to plead non-compliance with a specific regulatory safety standard.

### 3. Plaintiffs Adequately Plead Materiality of the Omitted Information

As explained above, to show materiality during the warranty period, Plaintiffs need only plead that the defect "would have caused [them] to not purchase the car if [it] had been disclosed." *Apodaca v. Whirlpool Corp.*, No. 13-00725 JVS (ANx), 2013 WL 6477821, at *7 (C.D. Cal. Nov. 8, 2013). To show materiality after the warranty period, Plaintiffs must allege that the defect causes an unreasonable safety hazard. *See Williams*, 851 F.3d at 1025.

#### a. In-Warranty Claims

Plaintiffs adequately plead that they would not have purchased the vehicles if they had known of the defect. *See*, *e.g.*, FAC ¶ 150 ("Had Plaintiff and the Class members known about the defective door latches, they would not have purchased Subject Vehicles or would have paid less for them."). This assertion is plausible. Plaintiffs have incurred out-of-pocket costs attempting to repair the defect. *See*, *e.g.*, FAC ¶¶ 18-23, 25-27. Issues caused by the defect have also inconvenienced Plaintiffs. *See*, *e.g.*, FAC ¶ 79 ("Mr. Baranco drives extra distances as needed to find night time parking that does not require him to reverse the vehicle" because of the interior

---

the fact that the keyless fob systems work as designed," whereas here, Plaintiffs clearly allege the door ajar warning did not work as designed).

[3] As explained above, the Court takes judicial notice only as to the existence of the findings, but not as to their truth or validity.

lights remaining on at night); *id.* ¶ 113 (Plaintiff Kubber complains of the "distracting ding sound" and the fact that "the interior light at times remained on [when the car was parked and turned off], running down the battery"). And, as explained in the following section, although there is no express allegation, it may reasonably be inferred from the FAC and the nature of the alleged defect that the defect may manifest suddenly and unexpectedly and give rise to safety issues. Several Plaintiffs have also sought repairs on more than one occasion. Thus, a reasonable juror could conclude that a person aware that they might have to deal with such inconveniences and additional costs would have behaved differently, either by not purchasing the vehicle or paying less for it.

Ford argues that Plaintiffs cannot demonstrate that the omitted information was material (*i.e.*, that it would have made a difference to their purchasing decisions) unless they allege that they could have purchased a vehicle free of the alleged defect. In other words, as Ford would have it, a plaintiff could demonstrate materiality only if he or she presented information about "the probability that such defects might occur in other vehicles that might be purchased instead." Mot. at 10. That is not the case.

*Munch v. Sears Roebuck & Co.*, 2007 U.S. Dist. LEXIS 62897 (N.D. Ill. Aug. 27, 2007), cited by Ford, is inapposite. There the plaintiffs brought consumer fraud claims alleging that their washing machines had a "substantial risk of mechanical failure." *Id.* at *7-8. Because the plaintiffs only alleged that their own machines required a single repair, failed to give a technical description of any particular defect, or provide any estimate of the number of other washers similarly affected, the court held that the pleadings were too bare because "it is understood that some percentage of all mass-produced complex machines will fail." *Id.* at *8. To the extent the plaintiffs had suggested there must be a defect because of the "high" incidence of repair, "they allege[d] no facts that give meaning to the term 'high.'" *Id.* at *11. In those circumstances, the court explained that the pleadings were too bare to assess materiality, because "[a] product's rate of failure would be material to a reasonable person only if it exceeded a standard rate of failure in the industry for comparable machines produced by comparable manufacturers." *Id. Munch* does not hold that a plaintiff must plead "a standard rate of failure in the industry"; it simply held that the pleadings must be specific enough to enable the court to infer a sufficiently pervasive problem

so as to be material.  The facts of this case are very different from *Munch*.  Plaintiffs have identified the specific defect, shown that it is inherent to all the vehicles as admitted in Ford's 2014 TSB, demonstrated that it affects thousands of other drivers, and that they and others have incurred costs attempting to repair it.  A reasonable jury could conclude from these allegations that Plaintiffs would not have purchased, or would have paid less, for the vehicles if they had been aware of the problem, a problem that allegedly is neither rare nor isolated.

Further, Ford's argument presents a false dilemma.  Plaintiffs do not need to plead they would have purchased a different vehicle (*i.e.*, that Ford's cars were worse than the competition) to demonstrate materiality.  All they need to show is that they would have behaved differently, *e.g.*, that they would not have purchased Ford's car or that they would have paid less for it, had they known the truth.[4]

Accordingly, insofar as the defect arises during the warranty period, Plaintiffs adequately plead materiality.

        b.    <u>Post-Warranty Claims</u>

For post-warranty manifestation of the defect, Plaintiffs must plead that the defect creates an unreasonable safety risk.  "Where a plaintiff alleges a sufficiently close nexus between the claimed defect and the alleged safety issue, the injury risk need not have come to fruition." *Williams*, at 1028.  However, if the nexus is not "sufficiently close," the plaintiff must allege examples of the safety risk coming to fruition to plausibly plead an unreasonable safety hazard. *Id.*

Plaintiffs have demonstrated specific safety risks directly associated with the defect in question.  In particular, when the door latch assembly fails:

- the vehicle issues false and distracting visual and/or audible signals that the doors are ajar;

- the automatic locking system does not function;

---

[4]  Ford's argument makes even less sense in the context of materiality on the basis of an unreasonable safety hazard, discussed in the next section, as it would create a race to the bottom. A consumer is not obligated to choose between competing unsafe vehicles.

- drivers are unable to lock the doors manually even when the car is in motion, creating a risk that young passengers may open the doors or persons outside may attempt to enter without permission;

- the interior dome light remains on even while the vehicle is in motion in dark conditions, impairing visibility; and

- the interior dome light may remain on even after the vehicle is turned off, draining the battery and increasing the risk of being stranded.

The causal connection between the defect and these symptoms is direct. Moreover, Plaintiffs have specific allegations that they or other consumers actually experienced several of the safety hazards. *See, e.g.*, FAC ¶ 79 (Plaintiff Baranco alleging his vehicle collided because the interior dome light would not turn off and he could not see); *id.* ¶ 105 (Plaintiff Jenkin's battery has drained a number of times because the interior dome light remains on); ¶ 51 (consumer reporting "vehicle's battery has also drained overnight to the point of needing a jump start"); *id.* ¶ 52 (consumer complaint reporting that "wife got out of the vehicle [to check doors] and was almost hit by a car at highway speeds"); *id.* ¶ 59 (consumer complaint reporting "[h]ad a stranger open my door and got in passenger seat thinking it was his mothers car"); *id.* ¶ 51 (consumer complaint reporting "child has opened the door on many occasions while vehicle was in motion and almost fell out"); *see also* NHTSA Findings at 1 (confirming 12 reports of occupants, mostly children, opening doors while vehicle was in motion).

Whether these safety risks are "unreasonable" is a separate question. Generally speaking, a key factor in analyzing "unreasonableness" of a safety hazard is whether it manifests without adequate warning to prevent a vehicle occupant from being placed in danger.[5] Though there

---

[5] *See, e.g., Apodaca v. Whirlpool Corp.*, 2013 WL 6477821, at *9 (C.D. Cal. Nov. 8, 2013) (plaintiff did not need to "wait until his dishwasher actually catches fire" to establish an unreasonable safety risk); *Ehrlich v. BMW of N. Am., LLC*, 801 F.Supp.2d 908, 918 (C.D. Cal. 2010) (windshield susceptible to cracking posed safety hazard because windshield was part of vehicle's safety restraint system, and cracked windshields could become dislodged, "compromising roof-crush resistance and causing serious head and neck injuries, failure of the passenger side airbag to deploy, or the ejection of passengers from the vehicle"); *Herremans v. BMW of N. Am., LLC*, 2014 WL 5017843, at *15 (C.D. Cal. Oct. 3, 2014) (water pump defect could cause engine to overheat at any time, and if it happened while vehicle was being driven, it would experience failures that render vehicle unable to accelerate and cause steering and braking

14

appears to be some lack of clarity as to when a progressive condition gives rise to an actionable safety hazard,[6] it is clear that a defect that manifests suddenly and without adequate warning can give rise to a such a claim.

As noted, although the complaint herein does not explicitly allege suddenness or surprise, it is plausible that the defect can arise even in the middle of a trip when the driver may not have an adequate opportunity to avoid the safety hazard. A jury could conclude that in such circumstances the defect could pose an unreasonable safety risk—such as the interior dome lights impairing night-time visibility while driving, the inability to protect vehicle occupants by locking the doors while in motion, and the risk of the battery draining and stranding a driver in an unsafe location. Although Ford argues that the safety risk is unreasonable only if drivers ignore the problem and fail to repair it promptly, a driver may be at risk as long as he or she is required to drive the vehicle before having an opportunity to service it.

The Court **DENIES** Ford's motion to dismiss the post-warranty claims.

4.    Reliance Under Illinois, California, North Carolina, and Michigan Law

Ford argues that Plaintiffs have inadequately pled reliance (and therefore causation) under the consumer protection laws of Illinois, California, North Carolina and Michigan. Plaintiffs only generally allege that they "have in fact been deceived as a result of their reliance on Defendant's material representations and omissions, which are described above." FAC ¶ 144.

---

problems); *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F.Supp.2d 1220, 1236-37 (C.D. Cal. 2011) (water leak defect could cause "sudden and unexpected engine failure that could result in personal injury or death"); *Marsikian v. Mercedes Benz USA, LLC*, 2009 WL 8379784, at *6 (C.D. Cal. 2009) (flooding of climate control system could "cause catastrophic engine and electrical system failure while the car is on the road" (quotation omitted)). *See also Denial of Defect Petition*, 80 FR 50379, 50381 (Aug. 19, 2015) (no unreasonable safety hazard due to back glass in convertible coming loose because of loss of adhesive qualities over time because "it appears that separation of the glass generally starts in a small area," "[o]ver time the separation can progress around the glass to a point at which the glass is visibly and physically loose," and may ultimately detach and fall into the vehicle); *Denial of Defect Petition*, 79 FR 44486, 44487 (Jul. 31, 2014) (no unreasonable safety hazard where defect may cause headlamp to fail, but it was very unlikely that *both* headlamps would fail simultaneously).

[6] *Compare Williams*, 851 F.3d at 1028 (alleged defect was not "unreasonable" where it "merely accelerates the *normal* and *expected* process of corrosion" (emphasis in original)) *with Daniel*, 806 F.2d at 1226 (holding that "[a] reasonable fact finder could infer that a vehicle that experiences premature and more frequent tire wear would pose an unreasonable safety risk").

Plaintiffs do not bring a claim under Michigan consumer protection law, so that issue is moot. For the remaining three states, Ford's argument is based on a contention that Plaintiffs must allege they read or reviewed advertisements by Ford to demonstrate reliance. This issue appears to require analysis under the laws of each state.

a.    California (Baranco and Nicolau)

Ford correctly argues that Plaintiffs must plead actual reliance under California law. *See Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) ("An essential element for a fraudulent omission claim [under the UCL and the CLRA] is actual reliance."). To demonstrate that reliance was a substantial factor, a plaintiff may "prov[e] that, had the omitted information been disclosed, one would have been aware of it and behaved differently." *Id.* (citation and quotation omitted). Awareness of the information and different behavior are two different sub-elements of reliance. *Id.* "That one would have behaved differently can be presumed, or at least inferred, when the omission is material." *Id.* (citation omitted). That is not the issue here, because Ford does not dispute that Plaintiffs have pled they would have behaved differently, *see* FAC ¶ 150 ("Had Plaintiff and the Class members known about the defective door latches, they would not have purchased Subject Vehicles or would have paid less for them."). In any case, California law permits such a presumption when the information is material, as Plaintiffs have established. *See In re Tobacco II Cases*, 46 Cal.4th at 327; *McAdams v. Monier, Inc.*, 182 Cal.App.4th 174, 184 (2010).

The parties dispute whether Plaintiffs have adequately pled the first sub-element, that they would have been aware of the omitted information had it been disclosed. The omissions analysis differs from affirmative misrepresentation principles where reliance requires the consumer to have seen or read the misrepresentation. *See, e.g., In re Tobacco II* Cases, 46 Cal.4th 298, 328 (2009) (in affirmative representation case, reliance satisfied where "a plaintiff alleges exposure to a long-term advertising campaign"); *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 595 (9th Cir. 2012) (no presumption of reliance permitted where "it is likely that many class members were never exposed to the allegedly misleading advertisements, insofar as advertising of the challenged system was very limited"). In contrast, in omissions cases, Plaintiffs need not plead that they

16

actually viewed a specific advertisement to satisfy this prong. Rather, a plaintiff must simply "establish a plausible method of disclosure and . . . that they would have been aware of information disclosed using that method." *Daniel*, 806 F.3d at 1227. In *Daniel*, for example, the plaintiffs satisfied that burden on summary judgment by introducing evidence "that they interacted with and received information from sales representatives at authorized Ford dealerships prior to purchasing their Focuses." *Id.* at 1226. That was sufficient even though "Ford presented evidence that conclusively establishes that Plaintiffs did not view any advertising materials produced by Ford prior to purchase." *Id.*

Because an omission case is premised on the defendant's affirmative duty to disclose, the "proper focus . . . is . . . what channels of information customers depend upon and whether the defendant could have taken action to disseminate information through those channels[.]" *Sloan v. General Motors* LLC, Case No. 16-cv-7244-EMC, --- F.Supp.3d ----, 2018 WL 784049, at *21 (N.D. Cal. Feb. 7, 2018); *see also* Restatement (Second) of Torts § 551, Comment on Subsection (2) (1977) ("If reasonable care is exercised, the fact that the information does not reach the person entitled to it does not subject [the defendant] to liability."). The plaintiff need only plausibly plead that they would have received the information if Ford had exercised reasonable care in disseminating disclosures about the defect, not that the plaintiff has actually read and reviewed specific advertisements.[7]

Here, Plaintiff Nicolau alleges she purchased her vehicle from an authorized Ford dealership, FAC ¶ 27, and Plaintiffs also allege that the dealerships acted as Ford's agents, *id.* ¶ 202. Though she does not specifically allege that she received information or promotional information from Ford or its agents at the dealerships, the Court can plausibly draw an inference in her favor that she could have received such information had Ford publicized the defect through the dealer, as it is highly improbable that she purchased her vehicle from a dealership without any exchange of information whatsoever (or at least an opportunity for such an exchange). *See*

---

[7] If they have received specific advertisements, though, that would likely support the plausibility of an inference that they would have received the omitted information if the defendant had exercised reasonable care in disseminating the omitted information. But it is not the only way to do so, as demonstrated in *Daniel*.

1   *Daniel*, 806 F.3d at 1226.  The Court therefore **DENIES** Ford's request to dismiss Plaintiff

2   Nicolau's claim.

3       However, Plaintiff Baranco purchased his vehicle from a private party, not a Ford

4   dealership.  *Id.* ¶ 78.  Although Plaintiffs generally plead that Ford disseminated marketing

5   materials to the public, they do not explicitly plead (even generally) that they received or reviewed

6   any information from Ford, not having interacted with a Ford dealer.[8]  Nor does Plaintiff Baranco

7   explicitly plead that he would have received the omitted information if Ford had exercised

8   reasonable care in disseminating it to the general market of consumers.  Accordingly, the Court

9   **GRANTS** Ford's motion to dismiss Plaintiff Baranco's claim with leave to amend to cure this

10  deficiency.[9]

11              b.    Illinois (Abruscato and Furno)

12      Ford argues Illinois law requires Plaintiffs Abruscato and Furno to allege that they actually

13  received a communication or advertisement from Ford to show causation/reliance.  *See De Bouse*

14  *v. Bayer AG*, 235 Ill.2d 544, 555 (2009) ("A consumer cannot maintain an action under the Illinois

15  Consumer Fraud Act when the plaintiff does not receive, directly or indirectly, communication or

16  advertising from the defendant.").

17      In *DeBouse*, the plaintiff alleged that the manufacturers of a cholesterol-lowering drug

18  _____

19  [8]  Plaintiffs argue that they have included "allegations that Ford communicated with Plaintiffs
    through its advertising and marketing of the Subject Vehicles," Opp. at 13, but the cited
20  paragraphs merely refer to Ford's general marketing at large or the fact that Plaintiffs purchased
    vehicles at Ford dealerships; they do not explicitly state that Plaintiffs received or reviewed the
21  general marketing or any other information.  *See* FAC ¶¶ 8, 28-29, 37-40, 85, 89, 92, 108.
    Moreover, Plaintiffs have not established that the marketing was so pervasive as to permit a
22  presumption or inference that they were exposed to it.  *Compare In re Tobacco II Cases*, 46
    Cal.4th at 327 (explaining that where "a plaintiff alleges exposure to a long-term advertising
23  campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the
    plaintiff relied on particular advertisements or statements") *with Mazza*, 666 F.3d at 595-96
24  (holding that a presumption of reliance is not justified where "it is likely that many class members
    were never exposed to the allegedly misleading advertisements, insofar as advertising of the
25  challenged system was very limited," and interpreting *Tobacco II* "in the context of a 'decades-
    long' tobacco advertising campaign where there was little doubt that almost every class member
26  had been exposed to defendants' misleading statements").

27  [9]  As explained above, Plaintiff Baranco does not need to plead that he viewed a particular
    advertisement or communication to meet the Rule 9(b) requirements.  Rather, under *Daniel*, he
28  simply needs to identify what reasonable steps Ford could have taken that would have resulted in
    him receiving the information.

concealed information that the drug could cause a serious medical condition (which later prompted the manufacturers to withdraw it from the market). Because the plaintiff in *DeBouse* had not suffered any side effects from the drug, her claim was based solely on economic damages based on a theory that the manufacturer's deceptive omissions about the drug's side effects caused prices to be artificially inflated. With respect to reliance and causation, the plaintiff had conceded that she "did not rely on any statements from [defendant] in purchasing [the drug]," but argued that *"a plaintiff need not receive a communication from the defendant to maintain a consumer fraud action when the deception results from the defendant failing to disclose material facts, or, in other words, committing deception by concealment."* *Id.* at 551. The Illinois Supreme Court rejected that argument, holding that "[i]f there has been no communication with the plaintiff, there have been no statements and no omissions," and that a plaintiff therefore "cannot prove proximate causation." *Id.*

The Illinois Supreme Court's reasoning concerning proximate causation in the context of an omission is somewhat puzzling. In particular, the conclusion that there has been "no omission" does not follow from the premise that "there has been no communication with the plaintiff" because it fails to consider whether, separate and apart from the communications that *actually* took place, there were others that *should* have taken place if the defendant had exercised reasonable care. Indeed, as explained above in the context of California law, the more sensible inquiry in an omission claim that already deals with a hypothetical realm is the *opportunity* to communicate; in other words, whether the plaintiff would have received the information if properly disclosed, not whether the plaintiff actually communicated with the defendant. Nevertheless, the Court is obligated to apply what appears to be the Illinois Supreme Court's holding in *DeBouse* with respect to Illinois state law: that a plaintiff must demonstrate he or she actually communicated with a defendant to demonstrate reliance in an omission case.[10]

---

[10] Plaintiffs cite the Illinois Supreme Court's earlier decision in *Connick v. Suzuki Motor Co., Ltd.* to argue that reliance is not required in an omissions case. *See* 675 N.E.2d 584, 593 (Ill. 1996) (holding that plaintiffs adequately pled a consumer fraud violation based on a material omission based on failure to disclose vehicle roll-over defect). However, the Illinois Supreme Court later explained in *DeBouse* that "in *Connick*, the plaintiffs received communications from Suzuki, through a car review piece within 'Car & Driver' magazine for which Suzuki provided misleading information," and thus

Plaintiff Abruscato alleges that she purchased her vehicle new from a Ford dealership, however. *Id.* ¶ 85. As explained above with respect to the California Plaintiffs, it is plausible to infer that Ms. Abruscato would have communicated with sales agents at that dealership in connection with her purchase. Further, as discussed above, Plaintiffs have alleged that the Ford dealerships were agents of Ford. These allegations are sufficient, at this stage, to support an inference that Plaintiff in fact communicated with Ford's agents, as apparently required by *DeBouse* to state an omission claim. The Court therefore **DENIES** Ford's request to dismiss Plaintiff Abruscato's claim. The claims are sufficient under Rule 9(b) because the "who" is Ford and its sales agents, the "what" is the door latch defect, the "where" is the point of sale at the dealership, and the "when" is prior to the sale. *See Sloan*, 2018 WL 784049, at *22 (discussing the relaxed standards for Rule 9(b) in the omission context); *see also MacDonald v. Ford Motor Co.*, 37 F.Supp.3d 1086, 1096 (N.D. Cal. 2014).

Plaintiff Furno, on the other hand, alleges he purchased his car from a used car retailer in Illinois, not a Ford dealership. *Id.* ¶ 100. The Court therefore cannot infer that he communicated with Ford or its agents or received any advertisements from them in which the omitted information could have been included. Accordingly, the Court **GRANTS** Ford's request to dismiss Plaintiff Furno's claim with leave to amend.

c.  North Carolina

Plaintiffs bring a claim under North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1. To state a claim, a plaintiff must allege "(1) the defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Sain v. Adams Auto Grp., Inc.*, 781 S.E.2d 655, 659 (N.C. Ct. App. 2016) (citation and quotation omitted).

Ford cites cases that hold actual reliance must be alleged and proved when a UDTPA claim is premised on a misrepresentation. *See id.* at 650 ("Where an unfair or deceptive practice claim is based upon an alleged misrepresentation by the defendant, the plaintiff must show 'actual reliance'

---

"it is clear that the plaintiffs in *Connick* relied . . . on direct statements from Suzuki that contained both misleading statements and material omissions." *DeBouse*, 235 Ill.2d at 555.

20

United States District Court
For the Northern District of California

on the alleged misrepresentation in order to establish that the alleged misrepresentation 'proximately caused' the injury of which plaintiff complains.") (citation omitted). Plaintiff takes this to mean that reliance must be proven only in cases involving an affirmative misrepresentation, not an omission. But *Sain* held in part that "Plaintiffs' amended complaint is wholly devoid of allegations tending to show . . . Plaintiffs' decision to purchase the vehicle was based on any actual misrepresentations *or omissions* made by Capital One." *Id.* (emphasis added). This suggests that actual reliance is also required to demonstrate causation in the case of an omission. Thus, it appears that under North Carolina law, reliance on an omission is required to state a UDTPA claim.[11]

Plaintiff Abbitt alleges he "purchased a new 2013 Ford Flex SE through the military." FAC ¶ 81. He does not allege that he interacted with a Ford dealership in connection with the purchase and would have received information therefrom. Thus, the Court **GRANTS** Ford's motion to dismiss Plaintiff Abbitt's consumer protection claim with leave to amend.

        5.        Plaintiff Kinnunen and the Michigan Consumer Protection Act

Ford argues that the Michigan Consumer Protection Act ("MCPA") does not support claims regarding the manufacture, marketing, sale, and warranting of motor vehicles because the Act exempts areas of commerce that are subject to extensive regulation pursuant to various state and federal statutes. Plaintiffs, in opposition, state that they do not bring a claim under the MCPA in their FAC, which is correct. Thus, Ford's motion is **DENIED** as moot with respect to Plaintiff Kinnunen.

        6.        New York General Business Law § 349 and Statute of Limitations

Ford argues that § 349 claims are subject to a three-year statute of limitations period and that Plaintiff Kubber's claim therefore began to run at the time of sale. *See Morelli v. Weider Nutrition Grp., Inc.*, 275 A.D.2d 607, 608 (App. Div. 2000); *Marshall v. Hyundai Motor Am.*, 51

---

[11] Even a case cited by Plaintiffs supports that conclusion. *See W. Franklin PRes. Ltd. P'ship v. Nurtur N.C., LLC.*, No. 14-cv-00266, 2016 U.S. Dist. LEXIS 69714, at *13 (M.D.N.C. May 27, 2016) (where UDTPA act claim was based on same theory of concealment as fraud claim, failure to demonstrate reliance on the concealment of material information would defeat UDTPA claim). The other case cited by Plaintiffs does not address omissions. *Bumpers v. Cmty. Bank of N. Va.*, 747 S.E.2d 220, 226 (N.C. 2013).

21

1   F.Supp.3d 451, 459 (S.D.N.Y. 2014). Plaintiff Kubber concedes that this claim is time-barred and

2   that he will not pursue it. Opp. at 6, n.4. The Court thus **GRANTS** Ford's request to dismiss

3   Kubber's claim under N.Y. G.B.L. § 349.

4   B.      Express and Implied Warranty Claims

5           1.      Failure to Give Notice

6           Ford argues that all Plaintiffs' claims, except Plaintiffs Baranco and Kubber, must be

7   dismissed for failure to give notice as required under the laws of their states. *See* 810 ILCS 5/2-

8   607(3)(a); N.Y. U.C.C. § 2-607(3)(a); Cal. Com. Code § 2607; Mich. Comp. Laws §

9   440.2607(3)(a); Fla. Stat. § 672.607(3)(a); N.M. Stat. § 55-2-607(3); N.C. Gen. State. § 25-2-

10  607(3); N.H. Rev. Stat. § 382-A:2-607.

11          Plaintiffs argue that notice was given when they presented their vehicles to the dealers for

12  repair of the defect. *See* FAC ¶¶ 82, 84 (Abbitt); ¶¶ 85, 87, 88 (Abruscato); ¶¶ 89-91 (Brown); ¶¶

13  92-94 (Caron); ¶¶ 97-98 (Farrell); ¶¶ 101-102 (Furno); ¶¶ 105-106 (Jenkin); ¶¶ 108-111

14  (Kinnunen); ¶¶ 116-118 (Nicolau). They argue such notice was adequate because Ford's warranty

15  itself instructs owners that "[y]ou are responsible for presenting your vehicle to a Ford Motor

16  Company dealer as soon as a problem exists." ECF Nos. 37-1 at 25, 37-2 at 25, 37-3 at 25 (sample

17  warranties). Moreover, Ford has a policy "that when a repair is made under warranty the

18  dealership must provide Defendant with detailed documentation of the problem and the fix

19  employed to correct it." FAC ¶ 46. Thus, notice to the dealers constitutes notice to Ford for

20  purposes of warranty repairs.

21          Ford counters that such notice is insufficient because it does not constitute notice of a

22  *breach*, but rather, simply a request for a repair; moreover, some vehicles were presented for

23  repair *after* the warranty coverage period. The success of this argument varies by state. In most of

24  the states at issue, the notice requirement is satisfied by presenting the car to an authorized

25  dealership for warranty service even if a breach is not specifically alleged. These states include

26  Illinois (Abruscato and Furno),[12] New York (Jenkin),[13] Florida (Farrell),[14] New Mexico (Caron),[15]

27

28  [12] *See*, *e.g.*, *Connick v. Suzuki Motor Co.*, 174 Ill.2d 482, 492 (Ill. 1996) ("Direct notice is not
    required when (1) the seller has actual knowledge of the defect of the particular product; or (2) the

North Carolina (Abbott),[16] and New Hampshire (Brown).[17]  Further, California (Nicolau)[18] does

---

seller is deemed to have been reasonably notified by the filing of the buyer's complaint alleging breach of UCC warranty." (citations omitted); *id.* at 493 ("[i]t is unnecessary to list specific claims of breach of warranty in giving notice under section 2-607 [but] it is essential that the seller be notified that *this particular transaction* is troublesome and must be watched" (citation and quotation omitted, emphasis in original)); *see also Overland Bond & Investment Corp. v. Howard*, 9 Ill.App.3d 348 (1972) (holding that towing a car to an autodealership and informing the employees that repairs were needed was sufficient to satisfy the notice requirement).

[13]  *See Cliffstar Corp. v. Elmar Indus., Inc.*, 254 A.D.2d 723, 724 (N.Y. Sup. Ct., App. Div. 1998) ("[T]he notice given by plaintiff had only to alert defendant that the transaction was troublesome and did not need to include a claim for damages or threat of future litigation" so "requests for service were sufficient to preserve plaintiff's right to sue for damages") (quotations, citations, and modifications omitted); *see also See Panda Capital Corp. v. Kopo Intern., Inc.*, 242 A.D.2d 690, 692 (1997) (holding that "the complaint and subsequent amended complaint in this action themselves constituted such notice" and that it was "at the very least an issue of fact as to whether reasonably timely notice of breach was given").

[14]  *See Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 976 (5th Cir. 1976) (notice "need not be a specific claim for damages or an assertion of legal rights," as long as the defendant is alerted that the transaction is "troublesome").

[15]  *Compare Schechner v. Whirlpool Corp.*, 237 F.Supp.3d 601, 609-10 (E.D. Mich. 2017) (analyzing New Mexico law under the same standard as Florida law and finding notice insufficient where plaintiff did not "request[] warranty service from Whirlpool" and did not "allege that the service companies were Whirlpool's authorized agents"); *Badilla v. Wal-Mart Stores East, Inc.*, 389 P.3d  1050 (N.M. Ct. App. 2016) (notice given three years after discovery of breach unreasonable where, inter alia, "Defendants lost an opportunity to be made aware of a defect in the boots that they might have corrected").

[16]  *See Halprin v. Ford Motor Co.*, 107 N.C.App. 423, 427-428 (1992) ("In our view, the express language in Ford's warranty booklet makes notice to Ford unnecessary.  The manufacturer cannot misdirect the uninformed consumer and then take legal refuge in the Code."); *Riley v. Ken Wilson Ford, Inc.*, 109 N.C.App. 163, 169 (1993) (notice sufficient where plaintiffs presented car for warranty service and thus gave "defendant adequate opportunit[y] to repair their car" (quotation and citation omitted)).

[17]  Ford did not cite any cases establishing that New Hampshire, as a matter of law, holds that notice is insufficient if it does not specifically allege a breach.  In the sole case cited, the plaintiff conceded that no notice had been given.  *Sawyer v. Purdue Pharm. Corp.*, No. 4:11-cv-01471, 2013 U.S. Dist. LEXIS 180740, at *19-20 (M.D. Pa. Dec. 27, 2013) (applying New Hampshire law).  New Hampshire law instead appears to defer to the fact-finder's analysis of the overall circumstances to determine the sufficiency of notice.  *See Pineau v. White*, 101 N.H. 119, 121 (1957) (notice "need take no special form and it is sufficient if the notice, whether written or oral, gives the seller timely information that the buyer holds him responsible for the breach of warranty" (citations and quotations omitted)); *Dudley v. Business Exp., Inc.*, 882 F.Supp. 199, 211 (D. N.H. 1994) (sufficiency of notice is "ordinarily a question of fact to be determined by a jury based on the surrounding circumstances").  In light of the lack of a clear categorical bar, the Court declines to dismiss Plaintiff Brown's claim at this time.

[18]  *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Prac., and Prods. Liab. Litig.*, 754 F.Supp.2d 1145, 1180 (C.D. Cal. 2010) (citing *Greenman v. Yuba Power Prods.*, 59 Cal.2d 57 (1963)).

1   not require notice to a defendant manufacturer if, as here, the consumer did not directly deal with

2   the manufacturer and the manufacturer was not the seller.[19]  The Court therefore **DENIES** Ford's

3   motion with respect to Plaintiffs Abruscato, Furno, Jenkin, Farrell, Abbott, Brown, and Nicolau.

4         Plaintiff Caron's claim under New Mexico law must be **DISMISSED**, however.  Although

5   a request for warranty service without specific notice of a breach appears to be sufficient under

6   New Mexico law, *see supra* n. 15, Caron did not present his vehicle for repair during the warranty

7   period.  There is no basis to infer that Ford would have been informed of a non-warranty repair

8   because Plaintiffs do not allege that Ford dealers were required to report non-warranty service

9   requests.

10         Finally, the Court **GRANTS** Ford's request to dismiss Plaintiff Kinnunen's claim because

11   Michigan requires notice of a breach (not just a request for warranty service).[20]

12         2.     <u>Express Warranty Claims</u>

13         Plaintiffs' express warranty claims fall in two camps: (1) Ford performed inadequate

14   repairs because it simply cleaned the contaminated sensors (*i.e.*, "burned the wires") rather than

15   repair the defect and (2) the warranty includes an "unconscionable" three-year or 36,000 mile limit

16   on the warranty when Ford knew that repairs for the door ajar defect would be required beyond

17   that period, such that requiring owners to pay for repairs after that time was also breach of

18   warranty.  Ford moves to dismiss the first category of claims on the basis that applying only a

19   temporary fix is not a breach of warranty and no Plaintiff alleges a refusal to apply any fix

20   whatsoever during the warranty period.  Ford moves to dismiss the second category for failure to

21   demonstrate unconscionability of the time limit.

22            a.    <u>Whether an inadequate repair breaches the warranty</u>

23         The terms of an express warranty govern whether a breach has occurred.  *Cipollone v.*

24

25   [19] *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Prac., and Prods. Liab. Litig.*,
754 F.Supp.2d 1145, 1180 (C.D. Cal. 2010) (citing *Greenman v. Yuba Power Prods.*, 59 Cal.2d 57

26   (1963)).

27   [20] *See Am. Bumper & Mfg. Co. v. Transtech. Corp.*, 252 Mich.App. 340, 347 (2002) (holding that
"it is not enough for the buyer to only notify the seller that it is having difficulty with the goods,"

28   but rather that plaintiff must also "notif[y] defendants that they were in breach"); *see also K&M
Joint Venture v. Smith Int'l, Inc.*, 669 F.2d 1106, 1113 (6th Cir. 1982).

*Liggett Group, Inc.*, 505 U.S. 504, 525-26 (1992). Ford's New Vehicle Limited Warranty guarantees that Ford "will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship." Eikey Decl., Ex. 1 at 9 (Docket No. 37-1) (2011 Warranty). The coverage period is 3 years or 36,000 miles, whichever comes first. The purpose of the warranty is "to remedy any such defects that result in vehicle part malfunction or failure during the warranty period." *Id.* The warranty limits remedies to "repair, replacement, or adjustment of defective parts." *Id.*

Plaintiffs Abbitt, Abruscato, Jenkin, Kinnunen, and Nicolau allege that they took their vehicles in for repair during the warranty period, but that Ford's "burn the wires" cleaning technique was not a true repair.[21] Rather than fix the underlying defect, it merely rendered the vehicle operable until the sensors once again became contaminated, usually outside the warranty period when Plaintiffs would be asked to pay for the costly replacement of the defective door latch assembly. Ford argues in its Reply that its warranty did not require it to do anything more. The warranty expressly states, "[n]othing in this warranty should be construed as requiring defective parts to be replaced with parts of a different type or design than the original part, so long as the vehicle functions properly with the replacement part." Eikey Decl., Ex. 1 at 9 (Docket No. 37-1) (2011 Warranty). Thus, the warranty does not require Ford to replace any part if other measures can remedy the malfunction.

Here, Ford merely "burned the wires" to cleanse the door latch sensors of corrosion causing the false warnings without replacing any parts. Nevertheless, the warranty permits Ford simply to make "adjustments" to correct the malfunctioning part. Although this adjustment may not have prevented eventual recurrence of corrosion and malfunctioning of the sensor after

---

[21] Plaintiffs Baranco, Furno, and Farrell do not allege that they experienced any failure or malfunction within the 3-year/36,000 mile coverage period, so they cannot allege a direct breach of the warranty. Moreover, none allege that they purchased their vehicles during the warranty period, so they lack standing to challenge the warranty period as unconscionable. Plaintiffs Furno and Farrell, however, suggest they can amend the complaint to allege purchase during that period. Accordingly, the Court **DISMISSES** Baranco, Furno, and Farrell's express warranty claims, while granting the latter two leave to amend—but only if they have a good faith basis to allege that the agreement was unconscionable under Florida and Illinois law (their states).

expiration of the warranty, the warranty does not appear to require Ford to do anything more. This situation is no different from the warranty related to any other part that will eventually require replacement outside the warranty period even where eventual, post-warranty replacement is predictable. Regardless of whether such a situation may give rise to another legal claim, it does not constitute a breach of the express warranty. Ford's motion to dismiss the express warranty claims is **GRANTED**.

b. Unconscionability of 3-year/36,000 mile coverage period

Plaintiffs Brown, Kubber, and Caron,[22] who did not seek warranty service during the coverage period, claim that the durational limits were unconscionable. They can demonstrate neither procedural nor substantive unconscionability.

Plaintiffs' sole argument for procedural unconscionability is that Ford "used its superior knowledge, bargaining power, and control over its dealerships and its customers to craft a nationwide TSB directing a 'repair' of the door ajar defect that was not a repair, surprising its customers with a re-manifesting defect and news that by 'repair' Ford actually meant 'temporary work-around.'" Opp. at 20. They cite no case-law to support this theory, however. Moreover, procedural unconscionability relates to contract formation. Plaintiffs Caron, Brown, and Kubber agreed to the terms of the warranty when they purchased their vehicles—before the allegedly unconscionable act of issuing a limited TSB in 2014 despite knowledge of a latent defect. Thus, Ford's 2014 TSB could not have spoken to formation of the contract at the time of their earlier purchases.[23] Plaintiffs fail to demonstrate procedural unconscionability.

---

[22] As to Plaintiffs Brown (New Hampshire) and Kubber (New York), both states require a plaintiff to demonstrate both procedural and substantive unconscionability. *See Chen v. Kyoto Sushi, Inc.*, No. 15-cv-7398 (DLI) (JO), 2017 U.S. Dist. LEXIS 155853, at *12 (E.D.N.Y. Sep. 22, 2017); *Pittsfield Weaving Co. v. Grove Textiles*, 430 A.2d 638, 639 (N.H. 1981). As to Plaintiff Caron (New Mexico), only one form of unconscionability needs to be demonstrated. *See Cordova v. World Fin. Crop.*, 208 P.3d 901, 908 (N.M. 2009).

[23] Even if such knowledge of the inadequacy of the TSB fix were demonstrated as of the time of the agreement, Plaintiffs do not address Ford's string-cite of 16 cases that reject the notion that a limitations period on a warranty is unconscionable based on the seller's knowledge of a latent defect. *See* Mot. at 22, citing, *e.g.*, *Chiarelli v. Nissan North Am., Inc.*, 2015 U.S. Dist. LEXIS 129416, at *19 (E.D.N.Y. Sep. 25, 2015) ("[T]he case law is clear . . . that a defendant's knowledge of a latent defect does not render unconscionable a limitation contained in an express warranty."); *cf. Abraham v. Volkswagen of Am., Inc.*, 795 F.2d 238, 250 (2d Cir. 1986)

26

Plaintiffs' only argument for substantive unconscionability is the "harsh and one-sided result . . . that Ford's customers ended up paying for repairs that should have been paid for by Ford." Plaintiffs cite no cases to support this theory, however. And as Ford points out, the argument is circular: Ford only "should have paid" for the repairs if the limitations period was substantively unconscionable, because the repairs were not needed until after expiration of the warranty period in question. Substantive unconscionability has not been demonstrated either.

Because Plaintiffs Caron, Brown, and Kubber cannot demonstrate either procedural or substantive unconscionability, the Court **GRANTS** Ford's request to dismiss their express warranty claims.

       3.    <u>Implied Warranty and Lack of Privity</u>

Ford argues that, except for Plaintiffs Brown, Caron, and Kinnunen (New Hampshire, New Mexico, and Michigan), all implied warranty claims must be dismissed for failure to allege vertical privity.

Plaintiffs generally allege that Ford dealers acted as agents of Ford and thus privity obtains via the agency. Ford claims these pleadings are not supported by factual allegations. The allegations that Ford issued a TSB instructing dealers how to repair the defect, that Ford's warranty directs vehicle owners to present their vehicles to dealers for repairs, and that Ford requires dealers to submit detailed data regarding repairs support a plausible inference that the dealers acted as Ford's agents. The scope of that agency relationship (and hence privity) is a question of fact. *Cf. In re MyFord Touch*, 46 F.Supp.3d at 956 (holding that "the scope of the agency is a factual one for the jury to resolve, especially as information about Ford's precise relationship with its dealers . . . is largely within Ford's possession, custody or control").

At least at the pleading stage, Plaintiffs Abbitt and Abruscato have adequately alleged

---

("Manufacturers always have knowledge regarding the effective life of particular parts and the likelihood of their failing within a particular period of time. Such knowledge is easily demonstrated by the fact that manufacturers must predict rates of failure of particular parts in order to price warranties and thus can always be said to 'know' that many parts will fail after the warranty period has expired. A rule that would make failure of a part actionable based on such 'knowledge' would render meaningless time/mileage limitations in warranty coverage."). Plaintiffs have not cited any cases holding the contrary.

agency to support privity, so the Court **DENIES** Ford's request to dismiss.  Plaintiffs state they are ready to amend the complaint to allege that Plaintiffs Kubber and Nicolau also purchased their vehicles from a Ford agent, so the Court **GRANTS** Ford's motion to dismiss their claims with leave to amend.  However, Plaintiffs Baranco, Furno, and Farrell allege that they purchased their vehicles from private parties or used car dealers, not a Ford dealership.  FAC ¶¶ 78, 96, 100.  Plaintiff Jenkin does not allege where the vehicle was purchased.  Accordingly, they have failed to allege privity under either an agency theory or a third-party beneficiary argument (because there is no agreement or relationship alleged between those private parties/used car dealers and Ford for which Plaintiffs could be third-party beneficiaries to begin with).

Accordingly, the Court **GRANTS** Ford's motion to dismiss Plaintiff Baranco, Furno, Farrell, and Jenkin's implied warranty claims with leave to amend to satisfy the privity requirement.

### 4.    Plaintiff Kinnunen's Implied Warranty Claim and Statute of Limitations

Michigan law provides that "[a]n action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued."  Mich. Comp. Law. § 440.2725(1).  "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach."  *Id.* § 440.2725(2).  Further, "[a] breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."  *Id.*  Thus, when a warranty extends to future performance, the 4-year limitation accrues as of the time of discovery of the breach.  "A warranty extends to future performance when the warranty explicitly provides that the goods will be free from defects for a specific period of time."  *Snyder v. Boston Whaler, Inc.*, 892 F.Supp. 955, 958 (W.D. Mich. 1994).

Kinnunen purchased his vehicle on July 18, 2011 (FAC ¶ 108) but he did not file his claim until April 4, 2017.  The parties do not dispute that this was outside the presumptive 4-year limitations period.  However, Plaintiff Kinnunen argues that the statute of limitations was extended until he discovered the breach because Ford's express warranty "extends to future

performance." Mich. Comp. Laws § 440.2725. He claims he did not discover the breach until he presented his vehicle to Ford's dealer a second time in February 2016 and was informed that the prior work performed under the warranty had not resolved the issue and further payments to repair the vehicle would be required. FAC ¶ 111.

The question is whether Kinnunen may bring a claim for *implied* warranty outside of the presumptive limitations period by operation of the *express* warranty's representations regarding future performance. Although one court has permitted such cross-tolling, *Ehrlich v. BMW of N. Am.*, LLC, 801 F.Supp.2d 908, 924-25 (C.D. Cal. 2010), it appears to be an outlier. *See MacDonald v. Ford Motor Co.*, 37 F.Supp.3d 1087 (N.D. Cal. 2014) (criticizing *Ehrlich* and holding that tolling only extends to the warranty which extends to future performance (i.e., the express warranty), not the implied warranty). *MacDonald* is more persuasive than *Ehrlich*. Like the Song-Beverly Act provisions at issue in *MacDonald*, the Michigan statute here states that "[a] breach of warranty occurs when tender of delivery is made, except . . . where a warranty explicitly extends to future performance . . . ." Mich. Comp. Laws § 440.2725. The "warranty" described in the second clause must be the same "warranty" allegedly breached in the first clause. The contrary interpretation would produce absurd results. For example, a product may provide for several express warranties covering varying durations of time; if any of these sufficed to extend the limitations period for all the other warranties (*i.e.*, the two clauses were read to refer to different warranties), then the purpose of the shorter limitations would be defeated. The express warranty's representations regarding future performance therefore do not cross-toll the statute of limitations for the implied warranty.

Accordingly, the Court **GRANTS** Ford's motion to dismiss Plaintiff Kinnunen's implied warranty claim under Michigan law because it was not brought within the 4-year limitations period.

### 5. Implied Warranty and Unmerchantability

To state a claim for breach of the implied warranty of merchantability, a consumer must demonstrate that a good sold by a merchant with respect to such goods is "fit for the ordinary purposes for which such goods are used." U.C.C. § 2-314(2). Ford argues that all Plaintiffs'

implied warranty claims must be dismissed for failure to plausibly allege they could not use their vehicles or that they limited use of their vehicles.

To show a vehicle is unmerchantable does not require showing that it is incapable of transporting; rather, the vehicle must be safe and reliable to be merchantable. *See In re MyFord Touch*, 46 F.Supp.3d at 980 ("As even Ford implicitly concedes, the ordinary purpose of a car is not just to provide transportation but rather safe, reliable transportation[.]"); *see also Isip v. Mercedes-Benz USA, LLC*, 155 Cal.App.4th 19, 27 (2007) (rejecting "the notion that merely because a vehicle provides transportation from point A to point B, it necessarily does not violate the implied warranty of merchantability" because "[a] vehicle that smells, lunches, clanks, and emits smoke over an extended period of time is not fit for its intended purpose"). Although the symptoms of the defect here are not as extreme as those alleged in *Isip*, Plaintiffs have alleged that the door ajar defect causes basic functions like locking of the doors to fail, with possibly safety-related consequences such as impaired visibility while night driving, vulnerability to intruders, danger to children when doors cannot be locked in motion, or battery draining. The severity of these issues and the extent to which they may have rendered the vehicle unmerchantable is a question of fact. *See also In re MyFord Touch Consumer Litig.*, Case No. 13-cv-03072-EMC, 2018 WL 887534, at *6 (N.D. Cal. Feb. 14, 2018) (holding that "the law does not require Plaintiffs to introduce proof that the vehicles were not in fact used to demonstrate unmerchantability," but that they "can also demonstrate unmerchantability by introducing evidence that their vehicles were affected by a persistent defect that so affected their safety, reliability, or operability as to render them unfit").

The cases cited by Ford are not squarely on point because they involved defects where operability was not impaired until a particular part malfunctioned and required replacement, but safety or operability was not otherwise affected. *See Suddreth v. Mercedes-Benz, L.L.C.*, 2011 U.S. Dist. LEXIS 126237, at *14 (D.N.J. Oct. 31, 2011) (defect that caused balance shaft to require premature but post-warranty replacement did not breach warranty of merchantability because "Plaintiffs all *admit* they were able to drive their vehicles for several years *without issue*" (emphasis added)); *Harnden v. Ford Motor Co.*, 2006 U.S. Dist. LEXIS 17942, at *1 (E.D. Mich.

Apr. 10, 2006) (holding that a "minor water leak (causing a three to four inch water spot)" was "insufficient to show that the Ford chassis is not merchantable," without indication that safety, reliability, or operability was affected); *Beshwate v. BMW of North Am., LLC*, 2017 U.S. Dist. LEXIS 164820 (E.D. Cal. Oct. 4, 2017) (allegations of frequent servicing and replacement of parts insufficient to make product unmerchantable, and no adequate showing of safety issue); *Greene v. BMW of N. Am.*, 2012 U.S. Dist. LEXIS 168695, at *11-12 (D.N.J. Nov. 28, 2012) (allegedly defective tire did not plausibly allege safety issue where plaintiff "was never injured by the alleged defect" and could not "provide the Court with some idea of the character or magnitude of the danger alleged"). Further, the *Greene* court found the unmerchantability allegations implausible because the plaintiff replaced his tires with the same allegedly defective and dangerous tires. *Greene*, 2012 U.S. Dist. LEXIS 168695, at *11-12. In contrast, here, all Plaintiffs except one have paid for repairs to correct the allegedly hazardous defect; the repairs did not simply replace the same allegedly defective and dangerous part. This bolsters the plausibility of their allegations regarding safety.

As noted above, Plaintiffs have adequately pled that the defect may manifest at any time and thus surprise drivers when they are already on the road. Thus, this case is similar to *MyFord Touch* where the MyFordTouch system could "suddenly malfunction." 46 F.Supp.3d at 959. Accordingly, Plaintiffs have pled that the vehicles could not provide safe and reliable transportation. The Court therefore **DENIES** Ford's motion to dismiss the implied warranty claims, but Plaintiffs have leave to amend to cure this deficiency.

C.      Declaratory Relief

Ford argues that the claim for declaratory relief should be dismissed because declaratory relief is not an independent cause of action, and all the other claims should be dismissed. Plaintiffs appear to acknowledge that the viability of declaratory relief claims rises and falls with the other causes of action. However, because the Court has not dismissed all pending claims, Ford's request is **DENIED**.

///

///

## IV.  CONCLUSION

In sum, Ford's motion to dismiss is:

**CONSUMER PROTECTION CLAIMS**

- **GRANTED** as to Plaintiffs Furno, Baranco, and Abbitt **with leave to amend** to plausibly plead reliance under the laws of their states;

- **GRANTED** as to Plaintiff Kubber **without leave to amend** because his claim is time-barred; and,

- **DENIED** as to the remaining plaintiffs because they adequately plead that the safety risk could manifest without adequate warning.

**EXPRESS WARRANTY**

- **GRANTED without leave to amend** as to all Plaintiffs because Ford's "burning the wire" technique did not breach the terms of the warranty.

**IMPLIED WARRANTY**

- **GRANTED** as to Plaintiffs Kubber and Nicolau **with leave to amend** that they purchased vehicle from a Ford agent or are third-party beneficiaries;

- **GRANTED** as to Plaintiffs Baranco, Furno, and Farrell **with leave to amend** to attempt to demonstrate exception to privity through third-party beneficiary status;

- **GRANTED** as to Plaintiff Caron for failure to give pre-suit notice **with leave to amend;**

- **GRANTED** as to Plaintiff Kinnunen as time-barred **without leave to amend**; and,

- **DENIED** as to the remaining plaintiffs because unmerchantability has been adequately pled through establishment of an unreasonable safety hazard.

///
///
///
///
///
///

This order disposes of Docket No. 36. Plaintiffs may file an amended complaint within 30 days from the date of this order.

**IT IS SO ORDERED**.

Dated: March 12, 2018

_____
EDWARD M. CHEN
United States District Judge