UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID BARANCO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>Defendant. | Case No. 17-cv-03580-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS**<br><br>Docket No. 110 |

Plaintiffs allege that Defendant Ford manufactured vehicles with defective door latch mechanisms that cause sensors to falsely indicate that a door is open when it is in fact closed, posing a variety of safety risks. Plaintiffs assert causes of action for breach of implied warranty and under consumer protection laws for failure to disclose a material defect. Pending before the Court is Ford's partial motion to dismiss three specific counts in Plaintiffs' Third Amended Complaint: (1) Plaintiff Abbitt's breach of implied warranty claim under North Carolina law; (2) Plaintiff Nicolo's New Jersey Consumer Fraud Act ("NJCFA") claims; and (3) Plaintiff Dicken's Ohio Consumer Protection Sales Practice Act ("OCPSA") claim. *See* Docket No. 110 ("Mot."). For the reasons below, the Court **GRANTS IN PART** and **DENIES IN PART** Ford's motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs allege that certain Ford and Lincoln vehicles contain defects in the door latch assembly that cause certain sensors to become contaminated over time and thus to falsely issue "door ajar" signals when the door is in fact closed. *See* Third Amended Complaint ("TAC"), Docket No. 100, ¶¶ 1–14. The affected vehicles are 2011–2016 Ford Edges, 2012–2014 Ford Flexes, 2013–2014 Ford Explorers, 2011–2013 Lincoln MKXs, and 2013 Lincoln MKTs (the "Subject Vehicles"). TAC ¶ 1.

The defect is inherent to the vehicles in question. In particular, the door latch assembly uses an integral electro-mechanical switch (*i.e.*, a sensor) that detects whether the door is open or closed based on the voltage signal received from the switch. TAC ¶ 37. The vehicles contain a Body Control Module ("BCM") that monitors the voltage from the door latch switch to determine whether the door is open or closed. *Id.* ¶ 38. When the switch indicates that the door is closed, the BCM sends a "wetting current" through the electrical connector from the door latch switch to the BCM that is supposed to keep the sensor clean. *Id.* A "wetting current" is "the minimum electric current needed to flow through an electrical contact to break through the surface film resistance on the contact" and to prevent a film of oxidation that may occur from humidity and exposure to moisture. *Id.* The defect arises from the allegation that the "wetting current" used by the Subject Vehicles is too low to prevent such surface film from accumulating, and thus too low to keep the sensor clean. *Id.* ¶ 49–51. In particular, beginning in 2011, "a change in BCM strategy resulted in a reduction of the wetting current sent out to clean the switch contacts by more than 75%," which Ford admits "is not sufficient to keep the switch contacts clean and contamination build up [then] causes them to fail." *Id.* ¶ 51.

As the contamination progresses, it interferes with the accuracy of the voltage readings, falsely indicating to the BCM that a door is open when it is in fact closed. This "triggers an audible warning, activates a visual warning on the instrument panel, and sends out a visual intermittent 'shift to park' message" because the faulty sensor causes the vehicle computer system to mistakenly believe the vehicle has stopped. *Id.* ¶ 50. In addition, "all interior lights are illuminated and the doors are unlocked, and they cannot then be manually relocked." *Id.* This "can continue for several hours, even after the vehicle is parked and turned off, draining the battery and potentially stranding vehicle occupants." *Id.* Furthermore, the defect causes the vehicle's autolock feature to fail. *Id.* ¶ 39. The autolock feature "will lock all the doors when: all the doors are closed, the ignition is on, you shift into any gear putting your vehicle in motion, and your vehicle reaches a speed greater than 12mph" as well as when "you open then close any door while the ignition is on and the vehicle speed is 9mph (15 km/h) or lower, and your vehicle then reaches a speed greater than 12 mph." *Id.*

Plaintiffs allege that Ford knew about the defect. In 2014, Ford issued a Technical Service Bulletin ("TSB") to dealerships describing in detail the defect and its cause. Ford recommended dealers use a special tool to perform a fix that would "clean" the sensors, a procedure known as "burning the wires." *Id.* ¶ 44–45. Plaintiffs describe this "fix" as a "work-around that did not repair the underlying defect but temporarily stopped it from manifesting for a short period of time." *Id.* ¶ 45. Allegedly, this allowed Ford to "give the false appearance of repairing the defect, and doing so at a lower repair cost and often during the warranty period." *Id.* Because it was a temporary fix, however, many customers reported recurrence of the defect, typically after the warranty period, at which point Ford would recommend that drivers "replace the entire door watch assembly at a significant cost to vehicle owners and lessees." *Id.* Plaintiffs suggest that Ford intentionally used a less expensive temporary fix during the warranty period in order to shift the cost of repairing the underlying defect onto consumers once their warranties expire. *Id.* (All the vehicles are subject to a three year or 36,000 mile "Bumper to Bumper" warranty. *Id.* ¶ 43.)

The defect has affected a significant number of vehicles. Plaintiffs allege that "[o]ver 2,670 people have reported false door ajar problems to [the National Highway Transportation Safety Administration ("NHTSA")] and Ford" just for the 2011–2013 Ford Edge vehicles, and "more than 33,000 warranty claims ha[ve] been submitted." *Id.* ¶ 52.

Plaintiffs claim the door latch defect creates various safety risks. Studies have shown that having a locked door that remains closed during an accident improves a vehicle's crashworthiness and reduces the likelihood of an occupant being ejected in a crash. *See id.* ¶¶ 62–65. Automatic door locks "improve the likelihood that doors will stay closed in the event of an accident, retaining the structural integrity of the vehicle and lowering the chance of occupant ejection." *Id.* ¶ 66. NHTSA "has repeatedly urged parents to purchase vehicles with automatic door locks." *Id.* ¶ 68. The inability to lock the doors while the vehicle is in motion permits passengers, such as young children, to open the doors while in motion. *Id.* ¶ 69. At least 14 consumers have reported doors opening while their vehicles were in motion. *Id.* ¶ 53. In addition, the inability to lock doors increases the risk of thefts (also known as "carjackings") occurring while passengers are in the vehicle. *Id.* ¶¶ 72–73.

3

Plaintiffs also allege that the audio and visual signals triggered by the "door ajar" sensor are distracting to drivers, causing some to pull over and check the doors, placing them at risk of being struck by vehicles on the roadway. *Id.* ¶¶ 74–79. In particular, when the interior dome lights remain on, especially at night, there is a "reduction in object visibility resulting from diminished contrast" as well as a distraction "from what is going on outside the car at night." *Id.* ¶ 79. Finally, because the lights will not turn off when the vehicle thinks the doors are open, even when the engine is off or the vehicle is parked, the battery may drain and has drained for consumers, "leaving them stranded and concerned for their safety." *See*, *e.g.*, *id.* ¶ 56.

Plaintiffs filed their First Amended Complaint in August 2017, and Ford moved to dismiss in October 2017. *See* Docket Nos. 18, 36. On March 12, 2018, this Court issued an order granting in part and denying in part Ford's motion. *See* Docket No. 83. Plaintiffs filed a Second Amended Complaint in April 2018. *See* Docket No. 93. The parties then stipulated that Plaintiffs would file a TAC without Ford responding to the Second Amended Complaint. *See* Docket No. 99. The TAC, filed on May 31, 2018, added four new named plaintiffs (April Nicolo, Gary Dicken, Greg Garat, and John Hannah). The TAC brings claims for violations of the consumer protection laws of the respective states where Plaintiffs purchased their vehicles as well as breach of the implied warranty of merchantability. *See* TAC ¶¶ 144–245. The Plaintiffs relevant to this partial motion to dismiss, their vehicles, and their states are listed in the chart below.

| Name | Vehicle | State | Purchase Date |
|---|---|---|---|
| James Abbitt | 2013 Ford Flex SE | NC | July 2013 |
| April Nicolo | 2016 Ford Edge (used) | NJ | December 2016 |
| Gary Dicken | 2013 Ford Edge | OH | December 2012 |

Ford moves to dismiss three counts in the TAC: (1) Abbitt's breach of implied warranty claim under North Carolina law; (2) Nicolo's NJCFA claims; and (3) Dicken's OCPSA.

## II. LEGAL STANDARD

On a Rule 12(b)(6) motion to dismiss, a court must take all allegations of fact as true and construe them in the light most favorable to the nonmoving party, although "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal."

4

*Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). While "a complaint need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than sheer possibility that a defendant acted unlawfully." *Iqbal*, 556 U.S. at 678.

### III. DISCUSSION

#### A. Plaintiff Abbitt's Implied Warranty Claim

North Carolina law requires that an "action for breach of any contract for sale must be commenced within four years after the cause of action has accrued." N.C. Gen. Stat. Ann. § 25-2-725(1). "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." *Id.* § 25-2-725(2). In particular, "[a] breach of warranty occurs when tender of delivery is made." *Id.* Ford argues that Abbitt's claim is time-barred by the statute of limitations in § 25-2-725(1) because he was first added as a named plaintiff in the First Amended Complaint, which was filed on August 18, 2017, approximately four years and one month after he took delivery of his vehicle on July 5, 2013. Mot. at 5; *see* TAC ¶ 85. But Plaintiffs insist that Abbitt's claim relates back to the original complaint, which was filed within the statute of limitations, on the basis that "the original complaint alleged breach of implied warranty on behalf of a nationwide class," of which "Abbitt was always a putative member." Docket No. 117 ("Opp.") at 4.

An amendment adding a party plaintiff relates back to the date of the original pleading under Federal Rule of Civil Procedure 15(c) only when: (1) the original complaint gave the defendant adequate notice of the claims of the newly proposed plaintiff; (2) the relation back does not unfairly prejudice the defendant; and (3) there is an identity of interests between the original and newly proposed plaintiff. *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 935 (9th Cir. 1996).

Within this test, "notice to the opposing party of the existence and involvement of the new plaintiff is the critical element." *Avila v. I.N.S.*, 731 F.2d 616, 620 (9th Cir. 1984). For

amendments that seek to expand the scope of a putative class, the notice requirement is satisfied when "the original complaint gave the defendant adequate notice of the claims of the newly proposed plaintiff[.]" *Syntex Corp.*, 95 F.3d at 935. Here, Ford argues it was not provided adequate notice of Abbitt's claim because the original complaint "included one Plaintiff (Baranco), who purchased a used 2013 Ford Edge in California," whereas Abbitt "purchased a new 2013 Ford Flex" in North Carolina. Docket No. 119 ("Reply") at 2. But the original complaint expressly brought its claims on behalf of a nationwide class comprising "[a]ll persons" who purchased "Subject Vehicles distributed for sale or lease in any of the fifty States." Docket No. 1 ¶ 68. The claims covered "2012 to 2014 Ford Flexes." *Id.* ¶ 1. This is sufficient to put Ford on notice that a North Carolina purchaser of a 2013 Ford Flex could bring claims based on the same alleged defect as the original named plaintiff. *See Sidibe v. Sutter Health*, No. 12-CV-04854-LB, 2017 WL 4310711, at *3 (N.D. Cal. Sept. 28, 2017) (holding that defendant had adequate notice of claims by newly-added employer-plaintiffs where "the original complaint [in which only individual plaintiffs were named] included 'entities' in the class definition"); *True Health Chiropractic Inc. v. McKesson Corp.*, No. 13-CV-02219-JST, 2014 WL 2860318, at *2 (N.D. Cal. June 23, 2014) ("A defendant has received adequate notice if the definition of the putative class includes the proposed class representative or the new class representative's claims are based upon the same or substantially similar underlying conduct.").

Ford also protests that notice was inadequate because the implied warranty claim in the original complaint "was expressly asserted only under California law," whereas Abbitt's implied warranty claim is governed by North Carolina law. Reply at 2. This argument misses the mark. The original complaint identified a single named plaintiff, who purchased his vehicle in California, but it did not limit its implied warranty claims to *only* that transaction. It also alleged generally that "Plaintiff and the other Class Members purchased the Subject Vehicles" that "when sold and at all times thereafter, were not in merchantable condition and were not fit for the ordinary purpose for which cars are used." *Id.* ¶¶ 97–98. And even if the original complaint had asserted only a California implied warranty claim, Abbitt's North Carolina claim arose from the same "conduct" alleged in the complaint, which means Ford had adequate notice of it. Fed. R.

6

Civ. P. 15(c)(1)(B); *see Zorrilla v. Carlson Restaurants Inc.*, 255 F. Supp. 3d 465, 477 (S.D.N.Y. 2017) (applying the same relation-back test as *Syntex Corp.* and concluding that an amendment adding new state law claims satisfied the "adequate notice" prong where the original complaint "brought a nationwide collective action premised on the allegation that Defendants apply the same employment policies, practices, and procedures" throughout the country).

As to the second element, Ford has not identified any unfair prejudice it would suffer from the addition of Abbitt's claim. Because that claim "depend[s] on the same conduct by defendant[] set forth in the original complaint, defendant[] will not have to radically change litigation strategy to defend against th[is] additional plaintiff[]." *Castle v. Wells Fargo Fin., Inc.*, No. C 06-4347 SI, 2008 WL 2079192, at *2 (N.D. Cal. May 15, 2008).

Plaintiffs have also satisfied the third element of the relation-back test because there is an identity of interests between Abbitt and Baranco. An identity of interests exists if "[t]he circumstances giving rise to the claim remained the same as under the original complaint." *Raynor Bros. Am. Cyanimid Co.*, 695 F.2d 382, 385 (9th Cir. 1982). Case law in this circuit suggests that plaintiffs share an identity of interest if the alleged defect underlying their claims is the same, notwithstanding that they did not purchase the exact same product at the exact same time and place. *See Allen v. Similasan Corp.*, 96 F. Supp. 3d 1063, 1069 (S.D. Cal. 2015) (finding identity of interest between original and proposed plaintiffs, even though they purchased different products from defendant, where they alleged defendant falsely labeled all its products and all its products were ineffective); *Moreyra v. Fresenius Med. Care Holdings, Inc.*, No. SACV1000517JVSRZX, 2012 WL 13014985, at *9 (C.D. Cal. Mar. 7, 2012) (holding that identity of interest existed between original and proposed plaintiffs where defendants' allegedly unlawful "policies and practices . . . are the subject of both complaints, and the factual allegations are virtually indistinguishable"). Thus, Ford's contention that there is no identity of interest between Abbitt and Baranco because they purchased different vehicle models in different states, at different times and in different conditions, is unavailing. *See* Reply at 3.

Abbitt's claim satisfies all three relation-back requirements and is therefore not barred by the statute of limitations. Ford's motion to dismiss Abbitt's implied warranty claim is **DENIED**.

B.  Plaintiff Nicolo's NJCFA Claims

1.  Failure to Disclose

Ford contends that Plaintiffs' claims under the NJCFA must be dismissed for failure to allege that Ford was *certain*, rather than merely aware of a likelihood, that the "door ajar" defect would manifest. Mot. at 6. Although there is no certainty requirement on the face of the statute, *see* N.J. Stat. Ann. § 56:8-2, Ford's position aligns with some authority holding that an element of a claim under the NJCFA for failure to disclose a defect is the defendant's certainty at the time of sale that the defect would cause the product to fail.

The case law reading a certainty requirement into the NJCFA originated with *Perkins v. DaimlerChrysler Corp.*, 890 A.2d 997 (N.J. App. Div. 2006). In *Perkins*, the plaintiff purchased a Jeep vehicle manufactured by DaimlerChrysler and, five years later, sued DaimlerChrysler because the Jeep "contain[ed] a less durable exhaust manifold than defendant should have incorporated, a fact which defendant did not disclose when the vehicle was purchased." *Id.* at 1000. At no point did the exhaust manifold in the plaintiff's Jeep actually fail or require repair; the plaintiff merely alleged that the exhaust manifold was "susceptible to cracking and premature failing." *Id.* at 999. The New Jersey Court of Appeals held that "a claim that a defect may, but has not, manifested itself until after the expiration of the warranty period cannot form the basis for a claim under the CFA."[1] *Id.* at 1004.

At no point did *Perkins* explicitly state that certainty is a required element of a NJCFA claim, but subsequent cases interpreted *Perkins* as imposing such a requirement. For example, *Alban v. BMW of North America, LLC*, No. CIV 09-5398 DRD, 2010 WL 3636253 (D.N.J. Sept. 8, 2010) held that because "the NJCFA does not require manufacturers to disclose things they do not know[,] . . . unless a defendant manufacturer knows with certainty that a product *will* fail, it

---

[1] Plaintiffs attempt to distinguish *Perkins* by claiming that "Defendant's unlawful conduct was not at issue" and the decision only addressed whether the plaintiff "suffered an ascertainable loss sufficient to support a claim under the NJCFA." Opp. at 5. Plaintiffs are incorrect. The court in *Perkins* clearly stated that whether or not an ascertainable loss was established, it "nevertheless affirm[s] the dismissal of the complaint because . . . the failure of a manufacturer or seller to advise a purchaser that a part of a vehicle may breakdown or require repair after the expiration of the warranty period cannot constitute a violation of the CFA." *Perkins*, 890 A.2d at 1004.

8

does not violate the NJCFA by failing to inform its consumers of the *possibility* of failure." *Id.* at *10 (emphasis in original) (citing *Perkins*, 890 A.2d at 1004). Applying this rule, the *Alban* court dismissed the plaintiff's claim that BMW had failed to disclose his vehicle was fitted with defective trunk insulation that emitted a "strange odor" because he did not adequately allege that at the time he purchased the vehicle, BMW knew with certainty that the insulation was defective. *Id.* at *11. *Alban* reasoned that "in the context of automobiles, the possibility of failure is best dealt with through the use of warranties rather than consumer fraud," by way of the New Jersey Lemon Law. *Id.* at *10 n.9. Similarly, in a suit alleging that Ford manufactured vehicles with defective plastic appliqués on the rear liftgate that tended to crack, a court in this District granted summary judgment for Ford, reasoning that Ford had no duty to disclose the defect under the NJCFA unless it "kn[ew] with certainty" that the component would fail. *In re Ford Tailgate Litig.*, No. 11-CV-02953-RS, 2015 WL 7571772, at *13 (N.D. Cal. Nov. 25, 2015).

Even some of the cases cited by Plaintiffs in attempting to argue against a certainty requirement actually reinforce Ford's position. *See* Opp. at 7 (citing *Maniscalco v. Brother Int'l Corp. (USA)*, 627 F. Supp. 2d 494, 502 (D.N.J. 2009) (finding that the NJCFA would not be "categorically inapplicable" where "a manufacturer or seller of a product *knew* that its product had a defect which *would* cause it to fail before its expected useful life, and intentionally concealed that information from a purchaser") (emphasis added); *In re Ford Motor Co., Spark Plug & 3-Valve Engine Prod. Liab. Litig.*, No. 1:12-MD-2316, 2014 WL 3778592, at *26 (N.D. Ohio July 30, 2014) (noting that Plaintiffs argued that "Ford knew in the case at bar that the defect would manifest during the warranty period")); *see also* Opp. at 6 (recognizing that *Alban* dictated "a manufacturer does not violate the NJCFA unless it knows with certainty that a product will fail" and that the defendant in *Alban* "knew that insulation was certain to fail") (citing *Alban*, 2010 WL 3636253, at *10).

On the other hand, some post-*Perkins* cases appear to suggest that absolute certainty of product failure is not a necessary element of a NJCFA claim. *See Francis E. Parker Mem'l Home, Inc. v. Georgia-Pac. LLC*, 945 F. Supp. 2d 543, 548, 560 (D.N.J. 2013) (denying motion to dismiss NJCFA claim based on plaintiff's allegation that defendant "knew" that the defective

9

product "was capable of" premature deterioration); *McCalley v. Samsung Elecs. Am., Inc.*, No. CIV.A. 07-2141 (JAG), 2008 WL 878402, at *8 (D.N.J. Mar. 31, 2008) (holding that plaintiff's allegation that defendant "knew or should have known" of product defect sufficed to state a NJCFA claim).

If a NJCFA claim for failure to disclose a defect indeed requires an allegation that the defendant knew with certainty the defect would manifest, Plaintiffs here falls short. None of the paragraphs they reference in the TAC on this point allege the requisite certainty. *See* TAC ¶¶ 9–12, 44, 46–49, 51–54, 58). What is more, paragraphs elsewhere in the TAC undermine their assertion that they alleged certainty. *See* TAC ¶ 44 (describing Ford's 2014 TSB informing dealers that Subject Vehicles "*may* exhibit a door ajar lamp illuminated with all doors closed) (emphasis added); *id.* ¶ 46 ("Defendant knew or *should have known* the door latch system was defective . . . .") (emphasis added). These allegations are similar to those dismissed as inadequate by the court in *Alban*. *See Alban*, 2010 WL 3636253, at *11 (holding that certainty was not adequately pleaded by plaintiff's allegations that "BMW knew or should have known at the time of manufacture and sale ... that the insulation used in the trunk [of his vehicle] was defective," and that "BMW admitted knowledge of said defect in or around November 2007 when they issued the TSB").

Ultimately, however, the certainty issue is not dispositive because the Court agrees with Plaintiffs that, to the extent the certainty requirement exists, it contains a safety exception that saves Plaintiffs' NJCFA claims. This safety exception also originated with *Perkins*. In dismissing the plaintiff's NJCFA claim, the *Perkins* court emphasized that its "determination is driven by the fact that, in this case, it was not alleged that the deterioration or failure of such a part represented a danger to others," and expressly qualified its ruling as "offer[ing] no view" as to "those circumstances in which safety concerns might be implicated." 890 A.2d at 1004. Thus, "[t]he New Jersey Court of Appeals left open the possibility that, in 'circumstances in which safety concerns might be implicated,' a manufacturer or seller may be liable for defects that manifest after the warranty expires." *In re Ford Tailgate Litig.*, 2015 WL 7571772, at *13. At least two subsequent cases have relied on *Perkins* to hold that the alleged failure to disclose a defect that

10

might compromise consumer safety constitutes a NJCFA violation, notwithstanding any certainty requirement. First, in *Nelson v. Nissan North America, Inc.*, 894 F. Supp. 2d 558 (D.N.J. 2012), the plaintiff alleged that the "transmission problems [in his vehicle] created a dangerous condition" whereby the vehicle exhibited "delayed and unpredictable acceleration response." *Id.* at 569. The court determined that these alleged safety concerns sufficiently distinguished the case from *Perkins*, and that the plaintiff "has stated a claim for relief pursuant to the NJCFA." *Id.* Second, in *Szymczak v. Nissan North America, Inc.*, No. 10 CV 7493 VB, 2011 WL 7095432 (S.D.N.Y. Dec. 16, 2011), the court opined that "*Perkins* did . . . provide an exception where the defect implicated safety considerations," in which case "the manufacturer or seller has a duty to inform the purchaser of the possibility that the vehicle may break down." *Id.* at *17 (dismissing NJCFA claim only because plaintiffs failed to establish a separate element of their claim).

Ford counters that "[t]he weight of authority" recognizes no safety exception, and cites a litany of cases in support. Mot. at 7–8; Reply at 7–8. But only one of these cases squarely held that there is categorically no safety exception. *See Chiarelli v. Nissan North America, Inc.*, No. 14-CV-4327 NGG VVP, 2015 WL 5686507, at *16 (E.D.N.Y. Sept. 25, 2015) (concluding that "there is no basis in *Perkins* or other New Jersey case law for a federal court to graft [a safety] exception onto the NJCFA"). The remaining cases all dismissed NJCFA claims on a different basis—that the alleged defects had never manifested within the warranty period, which meant that the defendants had no contractual obligation to repair the defects, *whether or not they caused safety risks*. Thus, the plaintiffs could not establish "ascertainable loss" arising from their contracts—a NJCFA element separate and distinct from certainty. *See, e.g.*, *Grodzitsky v. American Honda Motor Co.*, No. 2:12-CV-1142-SVW-PLA, 2013 WL 2631326, at *9 (C.D. Cal. June 12, 2013) (holding that "it is of no moment . . . that Plaintiffs allege that Defendant concealed defects and allege safety concerns" because "Plaintiffs do not, and cannot, allege that the Window Regulator Defect occurred during the warranty period"); *Nobile v. Ford Motor Co.*, No. CIV.A. 10-1890 POS, 2011 WL 900119, at *6 (D.N.J. Mar. 14, 2011) (same); *Duffy v. Samsung Elecs.*

11

*Am., Inc.*, No. CIV.06-5259 (DRD), 2007 WL 703197, at *8 (D.N.J. Mar. 2, 2007) (same).[2] These cases are thus inapposite here, since Plaintiffs allege that many consumers experienced the "door ajar" defect within their warranty periods. *See* TAC ¶ 52 (alleging that "more than 33,000 warranty claims had been submitted for these vehicles relating to false door ajar problems").

The *Perkins* court's reluctance to foreclose relief under the NJCFA to consumers whose safety is compromised by a defendant's failure to disclose a potentially dangerous product defect comports with the "clear legislative intent that [the NJCFA's] provisions be applied broadly in order to . . . root out consumer fraud." *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 696 A.2d 546, 551 (N.J. 1997). "In light of the broad legislative intent evident from the language and policy goals of the CFA," *id.*, and in keeping with New Jersey courts' instruction that "the Act should be construed liberally in favor of consumers," *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 461 (N.J. 1994), this Court finds that Plaintiffs' allegations that Ford's failure to disclose the "door ajar" defect poses risks to their safety are sufficient to state a claim under the NJCFA.

2. <u>Subsumption by NJPLA</u>

Ford then argues that, even if Plaintiffs' NJCFA claims fall within the safety exception, they should be dismissed because they are "subsumed and preempted by the New Jersey Product Liability Act" ("NJPLA"). Mot. at 8.

The NJPLA "establishe[s] the sole method to prosecute a 'product liability action'" in New Jersey law. *Tirrell v. Navistar Int'l, Inc.*, 591 A.2d 643, 647 (N.J. App. Div. 1991). The NJPLA defines a "product liability action" as "any claim or action . . . for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty." N.J. Stat. § 2A:58C-1(b)(3). In turn, "harm" is defined to mean, *inter alia*, "physical damage to property, *other than to the product itself.*" *Id.* § 2A:58C-1(b)(2) (emphasis added). Thus, the plain text of the NJPLA excludes from the statute's coverage claims for

---

[2] Even in *Noble v. Porsche Cars North America, Inc.*, 694 F. Supp. 2d 333 (D.N.J. 2010), where the court stated that it found the holding of *Perkins* "just as applicable . . . in a case where safety concerns are alleged," its dismissal of the plaintiff's NJCFA claim was ultimately premised on the fact that "at the time the defect manifested itself, Plaintiff's car was more than four (4) years outside of its original warranty." *Id.* at 338–39.

12

"physical damage . . . to the product itself," such as those alleged by Plaintiffs here.

Undaunted, Ford marshals three cases to argue that Nicolo's NJCFA claim "is 'obviously' a product liability claim" that is subsumed by the NJPLA. Mot. at 10. But none of the cases compels the result Ford advocates, because none involved the type of harm alleged here—the physical damage to the product itself that is expressly excluded from the scope of the NJPLA. First, in *Sinclair v. Merck & Co.*, 948 A.2d 587 (N.J. 2008), the New Jersey Supreme Court denied the NJPLA claim brought by plaintiffs who had used a prescription drug that was later withdrawn from the market because they had not alleged any of the types of harm defined in § 2A:58C-1(b)(2), such as "physical illness" or "injury." *Id.* at 594–95. But because "[t]he heart of plaintiffs' case is the potential for harm caused by Merck's drug," *Sinclair* concluded that "[i]t is obviously a product liability claim" that cannot be asserted under the NJCFA. *Id.* at 596.[3] Second, in *McDarby v. Merck & Co.*, 949 A.2d 223 (N.J. App. Div. 2008), the court dismissed the plaintiffs' NJCFA claims because the harm they allegedly suffered "'deriv[ed] from' personal physical illness, injury or death, pain and suffering, mental anguish or emotional harm, and loss of consortium" and therefore was "encompassed within the definition of harm set forth in the PLA." *Id.* at 278. Third, *DeBenedetto v. Denny's, Inc.*, 23 A.3d 496 (N.J. Law. Div. 2010), *aff'd*, No. A-4135-09T1, 2011 WL 67258 (N.J. Super. Ct. App. Div. Jan. 11, 2011), held that the plaintiff's NJCFA claim was subsumed by the NJPLA because "the essence of his complaint is . . . that he either suffered a physical injury or allegedly was put at risk of a physical injury from consuming food purchased at Denny's." *Id.* at 501–02.

Ford's subsumption argument has not found favor in other courts. In particular, the Third Circuit rejected the argument that a NJCFA claim based on Ford's failure to disclose an alleged defect in its Taurus vehicle's speed control system was subsumed by the NJPLA. *See Estate of*

---

[3] Ford urges in its reply brief that "*Sinclair* unequivocally establishes that a 'product liability' claim *can* be subsumed by the PLA even if the claim does not involve 'harm' as defined by the PLA." Reply at 9 (emphasis added). That is true, but *Sinclair* nowhere holds that a product liability claim *must* be subsumed by the NJPLA if it does not involve "harm" covered by the NJPLA. Indeed, if claims alleging harms *not* covered by the NJPLA are nevertheless subsumed, then consumers effectively have no recourse for such harms—they cannot bring claims under other statutes because they would be subsumed by the NJPLA, and the claims would not be cognizable under the NJPLA because the harms alleged are not recognized.

*Edward W. Knoster v. Ford Motor Co.*, 200 F. App'x 106, 108 (3d Cir. 2006). The court reasoned that the plaintiffs' NJCFA claim "seek[s] only economic damages resulting from harm to the Taurus itself," and "[t]he PLA excludes those damages from its definition of 'harm,' so the [plaintiffs'] CFA claim was not a 'product liability action.'" *Id.* at 116 (citing N.J. Stat. § 58C-1(b)(2), (3)). It concluded by emphasizing that "[t]he PLA cannot *subsume* that which it explicitly *excludes* from its coverage."[4] *Id.* (emphasis in original). *See also Tershakovec v. Ford Motor Co.*, No. 17-21087-CIV, 2018 WL 3405245, at *4 (S.D. Fla. July 12, 2018) (finding plaintiff's NJCFA claims for "economic damages relating to the purchase of a [vehicle] that did not live up to the hype" were not subsumed by the NJPLA because physical damage to the product itself are "excluded . . . from the definition of harm" in the NJPLA); *Francis E. Parker Mem'l Home, Inc. v. Georgia-Pac. LLC*, 945 F. Supp. 2d 543, 551 (D.N.J. 2013) (ruling that NJCFA claim arising from defective exterior trim products was not subsumed by the NJPLA because "[w]hile economic losses due to harm to the product itself are recoverable under the CFA, the PLA explicitly exempts such losses in its definition of harm" ); *id.* at 556 (distinguishing *Sinclair* because it contained "no discussion of subsumption, nor did there need to be, since "[h]arm to the product was not alleged").

Accordingly, Ford's motion to dismiss Plaintiffs' NJCFA claims is **DENIED.**

C.  Plaintiff Dicken's OCSPA Claim

    1.  Statute of Limitations

Ford argues that Dicken's claims under Sections 1345.02 and 1345.03 of the OCSPA are time-barred. A deceptive, unfair or unconscionable act can be a violation of the OCSPA "whether it occurs before, during or after" the underlying consumer transaction. *See* Ohio Rev. Code §§ 1345.02(A), 1345.03(A). But an action under Sections 1345.02 and 1345.03 "may not be brought

---

[4] The Third Circuit's decision in *Knoster* predated *Sinclair*, but once the case was remanded for further proceedings, Ford brought *Sinclair* and *McDarby* to the district court's attention. *See Estate of Knoster v. Ford Motor Co.*, No. CIV.A. 01-3168(MLC), 2008 WL 5416399, at *9 n.4 (D.N.J. Dec. 22, 2008). The court was not moved, finding that "[n]either case changes the critical fact that economic damages for destruction of the product are not recoverable under the PLA. Thus, the Court of Appeals' conclusion that the PLA does not subsume plaintiffs' CFA claim is unaffected by these two cases." *Id.*

14

more than two years after the occurrence of the violation which is the subject of suit." Ohio Rev. Code § 1345.10(C). "There is no discovery rule applicable to the statute; the two-year statute of limitations is absolute." *Bucy v. Aurora Loan Servs., LLC*, No. 2:10-CV-1050, 2011 WL 1044045, at *2 (S.D. Ohio Mar. 18, 2011).

Whether Dicken's OCSPA claims are time-barred turns on which alleged act by Ford constitutes a "violation" that triggers the two-year statutory period in § 1345.10(C). Dicken purchased his vehicle in December 2012, and was first named as a plaintiff in the Third Amended Complaint, which was filed more than five years later in May 2018. TAC ¶¶ 99–104. Thus, to the extent Dicken's claim rests on any misrepresentations that Ford made in connection with Dicken's purchase of his vehicle, it falls outside the statute of limitations. *See Kondash v. Kia Motors Am., Inc.*, Case No. 1:15-cv-506, 2016 U.S. Dist. LEXIS 185184, at *55–56 (S.D. Ohio June 24, 2016) (holding that plaintiff's OCSPA claim "accrued at the time of sale," where the "alleged 'violation' was Defendants' fraudulently concealing the true quality and nature of the sunroof and Kia Optima when [plaintiff] purchased it"); *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 45 F. Supp. 3d 706, 710–11 (N.D. Ohio 2014) (finding plaintiff's OCSPA claim time-barred because the alleged wrongful act of "marketing and selling Washing Machines with defects . . . and intentionally failing to disclose and/or concealing these known defects" occurred at the time of sale).

However, Plaintiffs argue that it is "Ford's continued failure to disclose the defect, its refusal to issue a recall, and the temporary work around that Ford began in 2014 and continued until 2018" that are the operative OCSPA violations. Opp. at 12. Ford responds that "Dicken's CSPA claim [as pleaded] is not based on either of these acts and neither of them constitute deceptive practices under the CSPA." Reply at 11. As an initial matter, the OCSPA claims based on Ford's "refusal to issue a recall" for the defect are raised for the first time in Plaintiffs' opposition brief and cannot be considered. *See Broam v. Bogan*, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003). And while Dickens *did* allege that "[d]uring any one of [his] multiple interactions with the Ford dealership, Ford could have disclosed the material fact of the defect," TAC ¶ 219, courts have consistently ruled that post-sale failures to disclose defects do not confer liability under the

15

OCSPA. For example, *Johnson v. Wal-Mart Stores E. Inc.*, No. 4:17CV1894, 2018 WL 1083269 (N.D. Ohio Feb. 28, 2018) rejected the plaintiff's argument that "the violation in this action consists of Defendant's failure to warn consumers of the defects in the patio set and/or issue a recall after it became aware of the defect," and after the plaintiff bought the patio set. *Id.* at *2. Similarly, *Kondash* did not recognize a continuing OCSPA violation where the plaintiff alleged that the vehicle manufacturer "fail[ed] to disclose the defect at any time []after" the sale. 2016 U.S. Dist. LEXIS 185184, at *56. And in *Gerstle v. American Honda Motor Co., Inc.*, No. 16-CV-04384-JST, 2017 WL 2797810 (N.D. Cal. June 28, 2017), this District concluded that an OCSPA claim was time-barred where it was brought more than two years after the sale of the defective vehicle, even though subsequent to the sale the defendant had issued multiple internal Technical Service Bulletins acknowledging the defect without disclosing the defect to the plaintiff.

Plaintiffs refer to a number of cases cited in *Montoney v. Lincoln Logs, Ltd.*, No. 06AP–284, 2007 WL 155451 (Ohio Ct. App. Jan. 23, 2007), as evidence that continuing violations are cognizable under the OCSPA. *See* Opp. at 11 (citing *Montoney*, 2007 WL 155451 at *10–11). None of them, however, suggest that a continuing failure to disclose or to issue a recall constitutes a continuing violation. In the first case, *Roelle v. Orkin Exterminating Co.*, No. 00AP-14, 2000 WL 1664865 (Ohio Ct. App. Nov. 7, 2000), the challenged warranty between the parties was renewed annually and "constituted a continuing contract" such that the statute of limitations "began to run[] only upon termination of the final renewal." The other two cases involved affirmatively deceptive acts post-sale. *See Keiber v. Spicer Const. Co.*, No. 98CA23, 1999 WL 335140 (Ohio Ct. App. May 28, 1999) (in which defendant "continued to represent that it would fix items that needed repair after the real estate transfer closed and within two years prior to the plaintiff filing a complaint"); *Hofstetter v. Fletcher*, 905 F.2d 897 (6th Cir. 1988) (in which "the defendants continued to provide the plaintiff with services and assurances, which themselves constituted deceptive or unconscionable acts, within two years prior to the plaintiff filing her complaint"). An affirmative misrepresentation is actionable post-sale, but omissions/failures to disclose are only actionable up until the point of sale. *See Temple v. Fleetwood Enterprises, Inc.*, 133 F. App'x 254, 265 (6th Cir. 2005).

1      Because Dicken cannot establish an OSCPA violation by Ford within the two years before
2  he joined this suit, his OCSPA claim is **DISMISSED with prejudice.**

### 2. Lack of Prior Notice for Class Claim

In light of the dismissal of Dicken's claim, the Court need not reach Plaintiffs' class claim under the OCSPA at this juncture. *See Corbin v. Time Warner Entm't-Advance/Newhouse P'ship*, 821 F.3d 1069, 1085 (9th Cir. 2016). However, the Court writes briefly to address the merits of the class claim.

Under Section 1345.09(B) of the OCSPA, "consumers may seek relief in a class action only if the defendant was sufficiently on notice that its conduct was deceptive or unconscionable under the statute at the time it committed the alleged acts." *In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801, 868 (S.D. Ohio 2012) (citing Ohio Rev. Code § 1345.09(B)). There are two ways for the defendant to be put on notice: (1) the alleged violation is an act or practice that was declared to be deceptive or unconscionable by a rule adopted by the Attorney General under Ohio Rev. Code § 1345.05(B)(2); or (2) the alleged violation is an act or practice that was determined by a court to violate the OCSPA and the court's decision was available for inspection before the transaction took place. Ohio Rev. Code § 1345.09(B). For a prior rule or court decision to constitute sufficient notice, the "act or practice previously declared to be deceptive" therein must be "substantially similar" to the defendant's alleged violation. *Marrone v. Philip Morris USA, Inc.*, 850 N.E.2d 31, 33 (Ohio 2006).

Plaintiffs point to a number of cases cited in their TAC purportedly holding that actions substantially similar to those attributed to Ford here violated the OCSPA. *See* TAC ¶ 218. Upon review, the Court finds that most of these cases do not involve violations "substantially similar" to Ford's alleged conduct to the extent that Ford can be deemed to have been put on notice that it was acting unlawfully. *See Marrone*, 850 N.E.2d at 36 ("'Substantial similarity' means a similarity not in every detail, but in essential circumstances or conditions."); *Gascho v. Glob. Fitness Holdings, LLC*, 863 F. Supp. 2d 677, 696–97 (S.D. Ohio 2012) (explaining that "substantial similarity" requires that both the type of industry involved and the misconduct alleged must be similar"). One of Plaintiffs' cited cases, however, does appear sufficiently similar to the instant

one to meet the notice requirement of Ohio Rev. Code § 1345.09(B). In *State ex rel. Brown v. Bud Fletcher Used Cars, Inc.*, the court declared that a car dealership's "act of selling an unsafe motor vehicle to another used ear dealer without disclosing the hazardous condition of that vehicle prior to sale, and with the knowledge that said vehicle would be sold or made available for sale to the consuming public, is unfair, deceptive, and unconscionable with respect to consumers" under the OCSPA. *Id.* No. A 8201791, OPIF #10000228 (Ohio Ct. C.P. Apr. 27, 1982), https://opif.ohioattorneygeneral.gov/opifimages/PIF228.pdf. Here, Ford's alleged misconduct also concerns the failure to disclose a known defect that might compromise safety in a vehicle intended for sale to consumers. *See* TAC ¶ 218 (alleging that Ford's violations include "concealing and/or not disclosing a dangerous defect"). Accordingly, there is merit to Plaintiffs' argument that *Bud Fletcher* put Ford on notice that its alleged actions in this case violated the OCSPA.

## IV. CONCLUSION

In sum, Ford's motion to dismiss is:

1. **DENIED** as to Plaintiff Abbitt's implied warranty claim;
2. **DENIED** as to Plaintiff Nicolo's NJCFA claims; and
3. **GRANTED** as to Plaintiff Dicken's OCSPA claim, **with leave to amend** to substitute in a new Named Plaintiff for the putative Ohio class.

This order disposes of Docket No. 110.

**IT IS SO ORDERED**.

Dated: October 26, 2018

_____
EDWARD M. CHEN
United States District Judge

18